IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ZACHARY SZYMAKOWSKI, an individual, on behalf of himself and a proposed class of similarly situated F-1 students, | **ORDER AND MEMORANDUM DECISION GRANTING TEMPORARY RESTRAINING ORDER** |
| Plaintiff, | |
| v. | 2:24-cv-00751-RJS |
| UTAH HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., a Utah nonprofit corporation; ROBERT CUFF, an individual; MARILYN RICHARDS, an individual; AMBER SHILL, an individual; BURKE STAHELI, an individual; DAVID WARREN, an individual; DAVID LUND, an individual; ZACK MCKEE, an individual; PAUL SWEAT, an individual; LUKE RASMUSSEN, an individual; JERRE HOLMES, an individual; JASON SMITH, an individual; MIKE MEES, an individual; DEVIN SMITH, an individual; BRYAN DURST, an individual; PATRICK LAMBERT, an individual; and BRENT STRATE, an individual, | Judge Robert J. Shelby |
| Defendants. | |

Plaintiff Zachary Szymakowski is a senior student at Juan Diego Catholic High School

(Juan Diego) in Draper, Utah.  He is an Australian citizen who currently resides in the United

States and attends high school on an F-1 visa.  Last spring, one of the Defendants in this action,

the Utah High School Activities Association, Inc. (UHSAA), adopted a rule stating that

international students on F-1 visas were only eligible for non-varsity level sports competition

unless the school attended by that student opted for an independent status or forfeited its

eligibility for postseason competition.  Mr. Szymakowski asserts that the rule violates the Equal

Protection Clause of the Fourteenth Amendment and asks the court for a preliminary injunction enjoining the rule's enforcement.  And because the final game of regular season play occurs tonight, Mr. Szymakowski has also moved the court to enter a temporary restraining order (TRO) immediately suspending any enforcement of the rule against him.  At a status hearing held on October 11, 2024, the Honorable Robert J. Shelby granted Mr. Szymakowski's motion for expedited briefing (ECF No. 3) and requested that the undersigned judge handle the TRO motion hearing while he was out of town.  The court then conducted an evidentiary hearing and heard oral argument on Mr. Szymakowski's motion for a TRO on October 16, 2024.

The court finds there is a strong likelihood that the Student Visa Eligibility Rule is unconstitutional.  And because the other factors the court considers all weigh in favor of granting the TRO, the court finds that Mr. Szymakowski should be allowed to play tonight's game without forfeiting his high school's eligibility for postseason competition.  The court therefore temporarily enjoins the enforcement of the Student Visa Eligibility Rule as it applies to Mr. Szymakowski and the remainder of his 2024 football season.

## BACKGROUND

Mr. Szymakowski is an eighteen-year-old senior high school student from Australia, who currently attends Juan Diego on an F-1 visa[1] that was lawfully issued by the United States. (Decl. Zachary Szymakowski ¶¶ 1–6, ECF No. 2-1.)  There is no evidence in the record that Mr. Szymakowski was recruited to play football at Juan Diego or that he was offered any financial incentives to attend the school.  Mr. Szymakowski states that he researched high schools across

---

[1] An F-1 visa "allows a noncitizen to enter the United States as a full-time student at a U.S. college, university, seminary, conservatory, academic high school, private elementary school, other academic institution, or in a language training program."  U.S. Citizenship & Immigration Servs. Policy Manual, Part F, Chapter 1.

the United States and chose Juan Diego both for the academic and athletic opportunities he could receive there, and because he wished to receive a Catholic-oriented education.  (<u>Id.</u> ¶¶ 8–9.)

Mr. Szymakowski is now in his second year at Juan Diego and resides with a host family. (<u>Id.</u> ¶¶ 6, 13.)  He has taken several Advanced Placement (AP) classes and serves as one of eight Student Body Officers.  (<u>Id.</u> ¶¶ 15–17.)  During his junior year, he made the Juan Diego varsity football team and started as the team's punter in nine out of ten games during the 2023-2024 season.  (<u>Id.</u> ¶¶ 18–19.)

Juan Diego competes in the 3A North region under the auspices of the UHSAA, an organization that governs high school athletics and fine arts activities at 159 member schools. (Decl. Rob Cuff ¶ 4, ECF No. 55.)  The UHSAA "operates through Region Boards of Managers, an Executive Committee, and a Board of Trustees."  (<u>Id.</u> ¶ 3.)

In addition to a declaration from Rob Cuff, the UHSAA's Executive Director, the UHSAA supplied a declaration and the court heard testimony from Craig Hammer, the Chair of the UHSAA Executive Committee and Chair of the UHSAA Constitution and Bylaws Committee.  Mr. Hammer states that recruitment of both local and international athletes has been a concern for twenty years, and that the UHSAA has especially noticed an increase in F-1 students coming to private Utah high schools during the last decade.  (Decl. Craig Hammer ¶¶ 3– 4, ECF No. 57.)  Mr. Hammer cites the example of Wasatch Academy, a private school that was required to take independent status more than ten years ago due to an influx of F-1 students.  (<u>Id.</u> ¶ 5.)  Mr. Cuff asserts that "the overwhelming majority of F-1 visa students that come to Utah attend one of the private schools, primarily Judge Memorial Catholic High School, Juan Diego Catholic High School, St. Joseph High School, and Layton Christian Academy.  Hundreds have attended and played sports for these schools while only a handful have attended any public

school." (Cuff Decl. ¶ 14.)  Mr. Cuff also notes that "[f]ederal law allows an F-1 visa student to choose his or her school and, if it is a private school, to remain at that school for up to four years. In contrast, if an F-1 visa student chooses to attend a public school, including charter schools, they may stay only one year." (Id.)  An international student's ability to choose one's high school and remain for more than a year at a private school is "unique to F-1 visa students." (Id. ¶ 18.)

In fall 2023, the UHSAA held a hearing to consider testimony from an F-1 student basketball player who accused teachers and administrators at Juan Diego of mistreatment and alleged that he was bullied by Juan Diego's coaches. (Hammer Decl. ¶ 6.)  Although he was failing classes, the school reported that his grades were high enough to make him eligible for competition. (Id.)  The UHSAA panel granted the student's request to transfer to a different school. (Id.)

In January 2024, the UHSAA received a letter from a lawyer representing several basketball coaches alleging that Layton Christian Academy (LCA), another private school, was recruiting and mistreating international students. (Id. ¶ 7.)  The letter stated that LCA's starting lineup consisted of students from Brazil, France, Serbia, Burundi, and Las Vegas. (Id.) Furthermore, the letter maintained that LCA associated with an entity in the United Kingdom called Ballers Heaven to recruit student athletes.[2] (Id.)

During the next three months, the UHSAA began a deeper investigation into the recruitment of foreign athletes and uncovered "irregularities in the guardianship and care of those players." (Id. ¶ 9.)  Mr. Hammer included an email from two former educators and

---

[2] The Ballers Heaven website includes links to basketball camps and tournaments in Utah, including pictures of Wasatch Academy and LCA.  Available at: ballersheaven.com (last accessed Oct. 16, 2024); (see also Ballers Heaven Website Postings, ECF No. 54-9).

coaches, who accused the head basketball coach at Juan Diego of recruitment practices. (Id. ¶¶ 10–11.) According to the email, current members of the basketball team were brought to the coach's office "where he showed them a website with pictures and measurements (height/wingspan) of potential players from Mali, Africa, asking their opinion on 'which one they should try and get.'" (Id. ¶ 11.)

> The UHSAA Handbook prohibits the recruitment of student athletes:
>
> Recruitment is a form of undue influence and is broadly defined as the use of undue influence or special inducement by anyone, on behalf or for the benefit of a member high school, who attempts to influence a student to enroll or transfer to a member school for the purpose of participating in athletics.
>
> …
>
> Recruiting shall include, but is not limited to, promising or inducing the expectation of an advantage over others for a particular team, playing time, of any athletic advantage, of employment of the student or a relative, of housing, of transportation, of specific tutoring, of scholarship or financial aid.

(UHSAA Handbook, Interps & Guidelines 1.10, ECF No. 54-19 at 40.) The UHSAA may impose a variety of penalties for violations of this rule, including probation, participation restrictions, forfeitures, fines, and a suspension from UHSAA-sponsored activities. (UHSAA Handbook, Interps & Guidelines 7.8, ECF No. 54-19 at 56–57.) But Mr. Cuff states that the UHSAA has struggled to enforce the ban against recruitment:

> Because the UHSAA has no subpoena power, the UHSAA cannot compel students, parents, coaches, or administrators to provide information that could lead to findings of, or absolve from suspicion of, recruiting, undue influence, falsifying documents, or other bases for ruling a student athlete ineligible. Thus, the UHSAA is largely powerless to police F-1 visa violations on a case-by-case basis, particularly if the member school administrators, coaches, and students do not voluntarily cooperate or self-report.

(Cuff Decl. ¶ 19.)

In response to concerns about the recruitment of international athletes, the UHSAA Constitution and Bylaws Committee met and determined that the rule about eligibility of F-1 student athletes should be examined.  (Hammer Decl. ¶ 13.)  The Committee looked at rules related to F-1 student eligibility from neighboring states and approved a draft bylaw on March 21, 2024.  (Id. ¶¶ 14–15.)  The Board of Trustees then discussed the proposed rule at a meeting on March 28, 2024.  (Id. ¶ 16.)  Finally, the UHSAA Executive Board discussed the rule at a meeting on April 24, 2024.  (Id. ¶ 17.)  Representatives from Juan Diego, LCA, and Judge Memorial Catholic High School were all present at the meeting.  (Id. ¶ 17.)

On May 1, 2024, the UHSAA adopted the Student Visa Eligibility Rule, which is published in UHSAA's handbook.  (See UHSAA Handbook, Inerps & Guidelines 1.9.3, ECF No. 54-19 at 38–40.)  The rule is introduced as follows:

> The UHSAA recognizes the concerns of its member school related to displacement of Utah students by students from foreign countries as well as recruiting of foreign players to be placed with Utah high school.  These rules are intended to preserve interscholastic competitive opportunities for Utah students and promote the unique competition fostered by the UHSAA.

(Id. at 38.)

The rule contains three parts.  Section A addresses foreign exchange students with a J-1 visa.[3]  These students need only meet academic eligibility requirements to be eligible to compete in varsity sports.  (Id.)  In addition, J-1 students need not comply with the UHSAA transfer rule—which applies to non-international students transferring from other schools—which would

---

[3]  J-1 visas are issued to aliens "having a residence in a foreign country which he has no intention of abandoning who is a bona fide student … who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of … studying …."  8 U.S.C. § 1101(a)(15)(J).

otherwise render the student ineligible for varsity competition until after the first half of the

varsity season for any sports played prior to the transfer.  (Id.)

       Section B of the rule addresses international students who hold F-1 visas:

> An international student with an F-1 visa issued by the U.S. Immigration and
> Naturalization Service is a student who attends high school in the U.S.  An
> international student with an F-1 visa is only eligible for non-varsity level
> competition unless the following condition is met: a member school may choose
> to compete with an F1 student at the varsity level, but the member school is not
> eligible for post-season competition.  Such member school must declare the use of
> an F1 student at the varsity level prior to the competition start date for that given
> sport and receive approval from the UHSAA.

(Id. at 39.)  It is undisputed that the rule applies to Juan Diego and that Juan Diego would be

barred from postseason competition if Mr. Szymakowski competed at the varsity level.

       Finally, Section C of the rule addresses international students with visas other than J-1

and F-1 visas.  These international students must follow the same UHSAA transfer procedures

that apply to any non-international students transferring schools.  (Id. at 39–40.)

       After the UHSAA adopted this rule, Mr. Szymakowski avers that his football coach,

Coach Danny Larson, and his international student advisor told him that discussions were

underway to grant Mr. Szymakowski an exception from the rule.  (Second Decl. Zachary

Szymakowski ¶ 2, ECF No. 62.)  It was not until shortly before the beginning of the football

season that Mr. Szymakowski learned that the UHSAA had denied his requested exception.  (Id.

¶ 3.)  Mr. Szymakowski repeated these assertions under oath during cross examination at a

hearing on the motion for a TRO, and the court finds them credible.

       Mr. Szymakowski and his parents then retained the law firm of Foley & Lardner on a pro

bono basis on August 28, 2024.  (Id. ¶¶ 4–5.)  Mr. Szymakowski's counsel sent a demand letter

by email to the UHSAA on September 10, 2024.  (ECF No. 2-3.)  The UHSAA replied on

September 18, 2024.  (ECF No. 2-4.)  Mr. Szymakowski then filed his complaint and motion for

a TRO on October 7, 2024.  (ECF Nos. 1–2.)  The court held a status hearing on October 11, 2024 (see Min. Entry, ECF No. 47) and set an expedited briefing schedule and hearing for the TRO motion.  (See Order dated Oct. 11, 2024, ECF No. 49.)  The court held a hearing on the motion on October 16, 2024, at which counsel for Mr. Szymakowski and for the UHSAA provided argument and cross-examined witnesses who had provided declarations either in support of or in opposition to the motion for a TRO.  (See Min. Entry, ECF No. 67.)

## LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure grants the court authority to issue a temporary restraining order or preliminary injunction.  "A temporary restraining order and preliminary injunction share the same standard."  Nunez v. Nunez, No. 1:13-cv-126-TS, 2013 WL 5230614, at *2 (D. Utah Sept. 12, 2013) (citation omitted).  A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. 418, 434 (2009).

Because a TRO "is an extraordinary remedy, the movant's right to relief must be clear and unequivocal."  Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting Wilderness Workshop v. BLM, 531 F.3d 1220, 1224 (10th Cir. 2008)).  But the Tenth Circuit considers some injunctions disfavored, and "require[s] more of the parties who request them."  Free the Nipple-Fort Collins v. City of Fort Collins, Colo., 916 F.3d 792, 797 (10th Cir. 2019).  An injunction is disfavored if "(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party

could expect from a trial win." Id.  When any of these three characteristics are present, "the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and balance-of-harms factors: [it] must make a 'strong showing' that these tilt in [its] favor." Id. (quoting Fish v. Kobach, 840 F.3d 710, 724 (10th Cir. 2016)).[4]

The Tenth Circuit defines the "status quo" as "the last peaceable uncontested status existing between the parties before the dispute developed." See id. at 798 n.3 (citing 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 (3d ed. & Nov. 2018 update)).  Further, the Tenth Circuit considers an injunction to "fall into the all-the-relief category only if its effect, once complied with, cannot be undone." Free the Nipple-Fort Collins, 916 F.3d at 798 n.3 (citations and quotations omitted)).  "[I]f the court 'probably can put the toothpaste back in the tube,' then the heightened standard does not apply." Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co., 434 F. Supp. 3d 1227, 1239 (D. Utah 2020) (quoting Free the Nipple-Fort Collins, 916 F.3d at 798 n.3).

## ANALYSIS

As a preliminary matter, the court is not persuaded that the requested TRO meets the requirements of a disfavored injunction.  First, the TRO is prohibitory, not mandatory.  It prohibits UHSAA from enforcing the Student Visa Eligibility Rule as it applies to Mr. Szymakowski for the remainder of his 2024 football season; it does not require the UHSAA to "affirmatively reinstate Plaintiff's eligibility, allow Plaintiff to compete in varsity football, and then allow Juan Diego to compete in the post-season tournament."  (ECF No. 53 at 13–14.)

---

[4] The Tenth Circuit does not require a moving party to demonstrate that each of the four requirements for a TRO "weigh heavily and compellingly in [the movants'] favor."  See Free the Nipple-Fort Collins, 916 F.3d at 797 (rejecting the "heavily and compellingly" standard).

Second, the court has considered the parties' arguments about the proper way to consider the status quo. The court agrees with Mr. Szymakowski that the last moment at which the status quo existed is April 30, 2024—the day before the UHSAA adopted the Student Visa Eligibility Rule. The UHSAA argues the status quo is "the status under which Plaintiff has lived since passage of the rule on May 1, 2024" because "plaintiff took no issue with the rule for the first five months following its passage." (ECF No. 53 at 13.) But, as discussed further below in the court's analysis of irreparable harm, Mr. Szymakowski testified that he indeed objected to the rule as soon as he learned it would prevent him from playing varsity football and took reasonable steps to oppose it. In any event, Mr. Szymakowski contests the constitutionality of the Student Visa Eligibility Rule; in such instances, the status quo is generally the state of affairs prior to enactment of the rule at issue. See Free the Nipple-Fort Collins, 916 F.3d at 798 n.3 (opining that the status quo was the state of affairs "existing before Fort Collins enacted the challenged public-nudity ordinance"); Makindu v. Ill. High School Ass'n, 40 N.E.3d 182, 193 (Ill. App. Ct. 2015) (explaining that "to return the parties to where they would have been without the controversy, they must be returned to where they were before the bylaw was enacted").

Third, the TRO awarded here does not functionally award Mr. Szymakowski "all the relief" he could expect from a trial win. See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1154–55 (10th Cir. 2001). The UHSAA argues a TRO would permit Mr. Szymakowski "individual access to varsity sports and team access to postseason play." (ECF No. 53 at 14.) But the UHSAA's focus on the benefits the TRO affords Mr. Szymakowski misunderstands the "all-the-relief" issue outlined in Free The Nipple, 916 F.3d at 798 n.3. The Tenth Circuit does not consider an injunction disfavored "simply because 'the plaintiff would get no additional relief if he prevailed at the trial on the merits.'" Prairie Band Potawatomi Indians,

253 F.3d at 1247 (quoting Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995)).  Rather, the Tenth Circuit looks to whether an injunction would "render a trial on the merits largely or completely meaningless."  Id.  Following this rational, the TRO Mr. Szymakowski seeks does not render a trial meaningless because it would provide him only temporary relief from the Student Visa Eligibility Rule.  The UHSAA could still prevail at trial and enforce the rule against Mr. Szymakowski and other F-1 visa students in subsequent athletic seasons.  See, e.g., id. at 1248; Free the Nipple-Fort Collins, 916 F.3d at 798 n.3; Equitable Nat'l Life Ins. Co., Inc., 434 F. Supp. 3d at 1239.

The court now considers the four factors that Mr. Szymakowski must establish to demonstrate that a TRO should issue in his favor.

## I.   Likelihood of Success on the Merits

### A.  The UHSAA Is a State Actor

The parties do not dispute that the UHSAA is a state actor for purposes of the Fourteenth Amendment and 42 U.S.C. § 1983.   The actions of a private association may qualify as state action when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (cleaned up).  The court therefore considers the UHSAA as a state actor.

### B.  The Student Visa Eligibility Rule Differentiates on the Basis of Alienage

The UHSAA argues that Mr. Szymakowski is not treated any differently from similarly situated students because it maintains that the proper reference group for equal protection analysis is the class of other F-1 students who are subject to similar requirements.  (ECF No. 53 at 20–21.)  But this reasoning is circular.  Courts would never find equal protection violations if

they only compared an individual member of a class to other members of the same class against which the state law was alleged to discriminate.  Here, the Student Visa Eligibility Rule plainly applies restrictions to students who attend school under an F-1 visa that are not applicable to other students.  The rule therefore treats Mr. Szymakowski differently on the basis of his alienage.  And it does not change the analysis that some international students are unharmed or even afforded preferential treatment by the rule—for instance, J-1 visa holders who are not subject to the transfer rule that applies to students transferring from other schools in the United States.  As the Supreme Court stated in <u>Nyquist v. Mauclet</u>, "[t]he important points are that [the regulation] is directed at aliens and that only aliens are harmed by it."  432 U.S. 1, 9 (1977).  Section B of the Student Visa Eligibility Rule applies only to a certain class of aliens, and only Mr. Szymakowski and other students on F-1 visas are harmed by the application of the rule.  The rule therefore differentiates on the basis of alienage.  Indeed, the rule explicitly states that its purpose is "to preserve interscholastic competitive opportunities <u>for Utah students</u>" and the rule is motivated by concerns from member schools about "the displacement of Utah students by students from foreign countries."  (UHSAA Handbook, <u>Interps & Guidelines</u> 1.9.3, ECF No. 54-19 at 38 (emphasis added).)

  This differential treatment is not necessarily unconstitutional.  But to make that finding, the court must first determine the appropriate level of scrutiny to apply to a state classification that differentiates on the basis of alienage.

### C.  Level of Scrutiny for State Classifications Related to Alienage

  Under the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of its laws."  The Supreme Court's modern interpretation of the Equal Protection Clause derives in large part from a footnote written during the run-up to World

War II, in which Justice Harlan Fiske Stone questioned "whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938). The Supreme Court has since focused on the class of persons affected by differential treatment. Ordinarily, a state law classification that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to some legitimate end." Vacco v. Quill, 521 U.S. 793, 799 (1997).

> The general rule gives way, however, when a statute classifies by race, alienage, or national origin. These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.

City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

The Supreme Court has held that the Equal Protection Clause applies to aliens, not just citizens. See, e.g., Plyler v. Doe, 457 U.S. 202, 215 (1982). Indeed, the Supreme Court has struck down multiple state laws on the grounds that those laws unlawfully discriminated against aliens. In Takahashi v. Fish and Game Commission, the Court held that a California statute denying fishing licenses to any "person ineligible [for] citizenship" was unconstitutional. 334 U.S. 410, 413 (1948). Although the law originally targeted Japanese fisherman, the amended statute distinguished between groups solely based on immigration status, with no mention of race or nationality. Id. The Court ruled that the Equal Protection Clause protected "aliens as well as citizens" and held that "all persons lawfully in this country shall abide … on an equality of legal

privileges with all citizens." Id. at 419–20.  Accordingly, "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits."  Id. at 420.

In Graham v. Richardson, holding that classifications by a State that are based on alienage are "inherently suspect and subject to close judicial scrutiny[,]" 403 U.S. 365, 372 (1971), the Court found that states could not restrict public assistance benefits solely to citizens and longtime resident aliens.  Id. at 376.  And in Nyquist, the Court applied strict scrutiny to strike down a New York statute that barred certain resident aliens from state financial assistance for higher education.  432 U.S. at 12.  See also Sugarman v. Dougall, 413 U.S. 634, 642–43 (1973) (invalidating New York statute that prohibited immigrants from working in the civil service); In re Griffiths, 413 U.S. 717, 721–22 (1973) (striking down Connecticut statute that barred immigrants from sitting for the bar); Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 601–06 (invalidating Puerto Rico law that denied licenses to immigrant engineers).

But the Court has not applied this searching level of review to all classifications based on immigrant status.  First, the Court has distinguished classifications of aliens made by the federal government from those made by a State on the ground that "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens."  Mathews v. Diaz, 426 U.S. 67, 84 (1976).  Accordingly, and in contrast to the state residency requirement that the Court struck down in Graham, the Court upheld a requirement that noncitizens reside in the United States for at least five years to be eligible for certain parts of the federal Medicare insurance program.  Id. at 83.

Second, the Court has applied only rational basis review to state laws that exclude aliens from political and governmental functions.  See Foley v. Connelie, 435 U.S. 291, 295–96 (1978) (upholding New York statute that restricted aliens from working as police officers); Ambach v. Norwick, 441 U.S. 68, 81 (1979) (agreeing that New York may prohibit aliens who are eligible for citizenship but who refuse to seek naturalization from employment as an elementary or secondary school teacher); Cabell v. Chavez. Salido, 454 U.S. 432, 447 (holding that California may require probation officers to be citizens).  The Court has characterized this "political-function exception" as "narrow[.]"  Bernal v. Fainter, 467 U.S. 216, 220–21 (1984) (striking down Texas statute that required notaries public to be citizens on the ground that these positions were essentially clerical, that the political-function exception did not apply, and that the statute did not "further[] a compelling state interest by the least restrictive means practically available").

Finally, the Court has applied less searching review to state laws that deny opportunities and benefits to undocumented aliens.  See, e.g., Plyler, 457 U.S. at 219; see also De Canas v. Bica, 424 U.S. 351 (1976) (upholding a California Labor Code provision that prohibited employers from knowingly employing an alien who was not entitled to lawful residence in the United States if such employment would adversely affect lawful residents, but considering the provision under the Supremacy Clause, not the Equal Protection Clause), superseded by statute on other grounds as stated in Chamber of Com. v. Whiting, 563 U.S. 582, 587–92 (2011).  In Plyler, the Court declined to apply strict scrutiny review to a Texas statute that prohibited undocumented alien children from attending public school.  457 U.S. at 223.  But the Court nevertheless struck down the law, holding that the statute could "hardly be considered rational unless it furthers some substantial goal of the State."  Id. at 224.  The Second Circuit has

characterized the Court's decision in <u>Plyler</u> as an application of a "<u>heightened</u> rational basis standard …." <u>Dandamudi v. Tisch</u>, 686 F.3d 66, 74 (2d Cir. 2012).

The Fifth and Sixth Circuits[5] have identified an additional category of laws in which they have found that rational basis is the appropriate standard of review: state laws that regulate nonimmigrant aliens.  In <u>LeClerc v. Webb</u>, the Fifth Circuit applied rational basis review to uphold a Louisiana law that prohibited anyone but citizens and lawful permanent residents from sitting for the Louisiana Bar.  419 F.3d 405, 410–11 (5th Cir. 2005).  The court noted that the Supreme Court had "reviewed with strict scrutiny only state laws affecting permanent resident aliens." <u>Id.</u> at 415.  And in <u>League of United Latin American Citizens (LULAC) v. Bredesen</u>, the Sixth Circuit upheld a Tennessee law that conditioned issuance of a driver's license on proof of citizenship or lawful permanent residence status.  500 F.3d 523, 526 (6th Cir. 2007).  The Sixth Circuit followed the Fifth Circuit's opinion in <u>LeClerc</u> to determine that "lawful permanent residents are the only subclass of aliens who have been treated as a suspect class." <u>Id.</u> at 533. The court therefore held that the classification at issue was "subject only to rational basis scrutiny." <u>Id.</u>

The court does not find these cases persuasive and declines to adopt a rule whereby state law classifications that affect resident aliens are subject to the highest level of scrutiny, whereas

---

[5] The Defendants would include the Eleventh Circuit in this category, citing <u>Estrada v. Becker</u>, 917 F.3d 1298 (11th Cir. 2019).  But that case concerns applicants who received deferred action under the Deferred Action for Childhood Arrivals (DACA) program and is more properly seen as a case about undocumented aliens.  <u>See id.</u> at 1305 (noting that the appellants were subject to removal proceedings and that a reprieve from those proceedings did not mean they were "lawfully present" under the Immigration and Nationality Act).  Indeed, the Eleventh Circuit found that the relevant policy (which required Georgia's three most selective colleges and universities to verify the "lawful presence" of the students they admitted) did not "classify applicants based on a suspect classification because '[u]ndocumented aliens cannot be treated as a suspect class.'" <u>Id.</u> at 1308–09 (quoting <u>Plyler</u>, 457 U.S. at 223).

state law classifications that affect nonresident or nonimmigrant aliens are subject to the lowest. Although the court agrees with the statement by the Fifth Circuit that the Supreme Court has applied strict scrutiny only to laws that affect permanent resident aliens, the court also agrees with the Second Circuit (who expressly declined to follow LeClerc and LULAC) that the Supreme Court has "never distinguished between classes of legal resident aliens." Dandamudi, 686 F.3d at 74. In other words, the Supreme Court has never addressed the question squarely.

But, as discussed above, the Supreme Court has considered laws that discriminate against undocumented aliens. Plyler, 457 U.S. at 219. Indeed, the Fifth Circuit in LeClerc recognized that "the Court employed a heightened level of rational basis review to invalidate a Texas law that denied primary public education to children of illegal aliens." 419 F.3d at 416 (citing Plyler, 457 U.S. at 224). But after characterizing the Plyler standard as a "sui generis level of rational basis review," id., the Fifth Circuit declined to apply even a heightened level of rational basis review to the Louisiana classification at issue, even though that classification affected lawful temporary residents. Id. at 420–21. This court is not persuaded by the Fifth Circuit's suggestion that the Plyler Court was simply "moved by the consequences and unfairness of enforcing such a regulation against children." Id. at 420. Given that the Supreme Court has applied a heightened level of review to classifications involving unlawful aliens, this court will apply at least some form of heightened review to classifications involving persons who are legally permitted to be in the United States. See Dandamudi, 686 F.3d at 78 ("If statutes discriminating against lawfully admitted nonimmigrant aliens were reviewed under a rational basis framework that would mean that a class of unlawful aliens would receive greater protection against state discriminatory statutes than those lawfully present.").

The court declines to follow <u>LeClerc</u> and <u>LULAC</u> for several additional reasons.  First, both cases involve restrictions—relating to identification documents and the ability to become a lawyer—that are far more similar to the types of restrictions the Supreme Court considered in its political-function cases, such as restrictions on who could be become a police officer, probation officer, or primary school teacher.  The restrictions on Mr. Szymakowski are not related to any political or governmental functions.  Second, the distinction between resident and nonresident aliens is not always clear.  The Internal Revenue Service, for instance, indicates that "foreign students in F-1, J-1, or M-1 nonimmigrant status who have been in the United States more than 5 calendar years become resident aliens for U.S. tax purpose if they meet the 'Substantial Presence Test' and are liable for Social Security and Medicare taxes."[6]  While there is no suggestion that Mr. Szymakowski qualifies as a resident alien for tax purposes (nor would most international high school students), he might well become a resident alien if he attends college in the United States.  And while F-1 visas are nonimmigrant visas in which an applicant must not evince an intent to remain permanently in the United States, the U.S. Citizenship and Immigration Services recognizes that holders of other nonimmigrant visas (such as holders of H-1B visas, K visas, L visas, and V visas) are allowed to enter the country and later apply for an adjustment of status to an immigrant visa.[7]  The court is skeptical that the Supreme Court would apply widely divergent levels of scrutiny for classifications affecting different categories of aliens when those categories themselves are somewhat fluid.

---

[6] IRS, Foreign Student Liability for Social Security and Medicare Taxes, available at: www.irs.gov/individuals/international-taxpayers/foreign-student-liability-for-social-security-and-medicare-taxes (last accessed Oct. 17, 2024).

[7] <u>See</u> U.S. Citizenship & Immigration Services, Change My Nonimmigrant Status, available at: www.uscis.gov/visit-the-united-states/change-my-nonimmigrant-status (last accessed Oct. 17, 2024).

Most importantly, the majority opinions in LeClerc and LULAC do not adequately address an argument that has buttressed much of the Supreme Court's equal protection jurisprudence related to alienage classifications: namely, that the "National Government has 'broad constitutional powers in determining what aliens shall be admitted to the United States, the period they remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.'" Graham, 403 U.S. at 377 (citing Takahashi, 334 U.S. at 419); see also LeClerc v. Webb, 444 F.3d 428, 429 (5th Cir. 2006) (Higginbotham, J., dissenting from the denial of a rehearing en banc and criticizing the majority for its "puzzling" silence in ignoring the doctrine of federal preemption).  Finding that there was "[a]n additional reason why the state statutes at issue in these cases do not withstand constitutional scrutiny" in addition to equal protection concerns, the Supreme Court observed in Graham that "State laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with these overriding national policies in an area constitutionally entrusted to the Federal Government." Id. at 378.

In Toll v. Moreno, the Supreme Court struck down a University of Maryland policy that denied in-state tuition status to the children of parents with nonimmigrant alien visas—in that case, parents with G-4 visas.  458 U.S. 1 (1982).  But the Court declined to consider "whether the policy violate[d] the Due Process or Equal Protection Clauses" because it found that the policy ran afoul of the Supremacy Clause.  Considering its previous equal protection jurisprudence, the Court stated: "Read together, Takahashi and Graham stand for the broad principle that 'state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.'" Id. at 12–13 (citing De Canas, 424 U.S. at 358 n.6).

In <u>Toll</u>, the Court was presented with the exact question addressed in <u>LeClerc</u> and <u>LULAC</u>—namely, how to consider an equal protection challenge to a statute that discriminated against nonimmigrant aliens—but declined to create an exception to the strict scrutiny analysis it had employed in other alienage cases. <u>Id.</u> at 12–13. In a vigorous dissent in the <u>LULAC</u> case, the Honorable Ronald Lee Gilman noted that the <u>Toll</u> Court tacitly affirmed the lower court's use of strict scrutiny review for laws affecting either immigrant or nonimmigrant aliens:

> In bypassing the equal-protection question in [<u>Toll</u>], moreover, the Supreme Court necessarily left undisturbed the district court's holding, later adopted without qualification by the Fourth Circuit, that all legal aliens "who maintain their place of general abode within the United States," whether "immigrant or nonimmigrant" aliens, are "wrapped … in the suspect classification blanket" and entitled to have laws that discriminate against them subjected to strict scrutiny. <u>Moreno v. Toll</u>, 489 F. Supp. 658, 663–64 (D. Md. 1980), <u>aff'd by</u> <u>Moreno v. Univ. of Md.</u>, 645 F.2d 217, 2024 (4th Cir. 1981) (per curiam) (affirming the district court's equal-protection holding "[f]or reasons sufficiently stated by the district court"). Reading <u>Plyler</u> and [<u>Toll</u>] in conjunction with <u>Graham</u> yields the inescapable conclusion that all lawfully admitted aliens—permanent and temporary alike—remain members of an inherently suspect class.

500 F.3d at 544 (Gilman, J., dissenting).

The Court has not issued a ruling on an analogous alienage equal protection case since 1982—the year the Court decided both <u>Plyler</u> and Toll. This court therefore looks to those two cases for guidance and determines 1) that the court must apply a form of heightened scrutiny to classifications affecting lawful temporary immigrants that is at least as searching as the heightened rational basis review the Court applied to the policy affecting undocumented aliens in <u>Plyler</u>; and 2) the court must determine whether any state rules affecting lawful temporary immigrants run afoul of Congress's power to set the conditions, benefits, and restrictions of immigrant aliens.

The court's legal analysis is consistent with the ruling from a federal district court in South Dakota, which issued a preliminary injunction in a case with nearly identical facts. <u>See</u>

Entwistle v. S. Dak. High Sch. Activities Ass'n, 2006 WL 8453556 (S. Dak. Mar. 24, 2006).  In

that case, the South Dakota High School Activities Association (SDHSAA) adopted a rule

barring students with an F-1 visa from participating in interscholastic athletics (a more restrictive

ban than the rule at issue here) unless the SDHSAA granted the student a waiver (a less

restrictive ban than the rule at issue here).  Id. at *3.  Citing a decision from the Eighth Circuit, in

which that court upheld a TRO enjoining a Nebraska high school from excluding a girl from the

cross-country running team, the South Dakota court held: "When the start of the season is

imminent and the plaintiff has alleged that exclusion from the team violates the Equal Protection

Clause, the court may grant a TRO to permit an athlete to take part in high school sports."  Id.

at *1 (citing Bednar v. Neb. Sch. Activities Ass'n, 531 F.2d 922 (8th Cir. 1976) (per curiam)).

The court found: "Under the plain language of the rule, it only applies to aliens and therefore

classifies students based on alienage."  Id. at *3.  The court also held that, "[b]ecause the

SDHSAA F-1 visa rule is a state classification based on alienage, it is subject to strict scrutiny."

Id. at *4.

    The South Dakota court's ruling is consistent with state courts who have considered

similar circumstances.  See Fusato v. Wash. Interscholastic Activities Ass'n, 970 P.2d 774, 769–

79 (Wash Ct. App. 1999) (applying strict scrutiny to rule forbidding alien students from playing

varsity sports); Makindu, 40 N.E.3d at 191 (declining to determine level of scrutiny but

upholding a preliminary injunction on the ground that the plaintiff "raised a fair question" that an

association's bylaw prohibiting certain international students from participating in interscholastic

sports would pass even rational basis review).  And in Monga v. National Endowment for the

Arts, a district court in Maine issued a TRO requiring the National Endowment for the Arts, a

federal administrative agency who had barred an immigrant student from a national poetry

competition, to allow the student to compete.  323 F. Supp. 3d 75, 96 (D. Me. 2018).  The court

determined that a "harder look than rational basis review is warranted," although the court found

it unnecessary to apply strict scrutiny to decide the case.  Id. at 93–94.

      Reviewing the relevant caselaw, the court finds no reason to carve out an exception from

the Supreme Court's general rule that state classifications based on alienage are subject to strict

scrutiny.  In any event, the court finds that the Student Visa Eligibility Rule does not survive

even a more intermediate level of review, and therefore applies only a heightened level of

scrutiny for its analysis in this expedited review.

### D.  The Rule Does Not Survive Heightened Scrutiny

      To survive heightened scrutiny, a law or rule must be "substantially related to a

sufficiently important government interest."  Fowler v. Stitt, 104 F.4th 770, 794 (2024).  The

UHSAA has cited two important government interests: first, an interest in preventing the

mistreatment of students on F-1 visas; and second, an interest in ensuring fair competitions for

high school students in Utah.

      The court agrees that the prevention of student abuse is an important government interest

but finds that the adopted rule is not congruent with that result.  The record before the court

includes a declaration from Kirk Bengtzen, who hosted an international basketball player named

"David" while that student attended Juan Diego on an F-1 visa.  (Decl. Kirk Bengtzen ¶ 3, ECF

No. 59.)  Mr. Bengtzen alleges that David's F-1 visa form, which was countersigned by Juan

Diego's admissions director, contained falsehoods about the cost of tuition and the funds that

David would supply (id. ¶ 12), that David struggled academically at Juan Diego but was still

allowed to compete (id. ¶¶ 8, 15), that David was yelled at by the basketball coach (id. ¶ 17), and

that the school refused to provide David with health insurance (id. ¶ 22).  Mr. Bengtzen also

states that another coach swore at David and two other black basketball players for practicing in the gym (id. ¶ 23) and that a school administrator grabbed David and threw him to the ground for wearing a sweatshirt (id. ¶ 25). And in a separate allegation against LCA, Mr. Hammer maintains that the UHSAA "received information about 6 F-1 visa basketball students sleeping on the floor of a host family home, some becoming homeless, or living on their own." (Hammer Decl. ¶ 18.)

These allegations are deeply concerning. But what is more concerning is that it does not appear that any of the coaches or school officials at Juan Diego or LCA have been disciplined for these acts. The UHSAA argues that "permitting F-1 students to participate in varsity sports place[s] those students at significant risk of exploitation and abuse from some school administrators and coaches who care[] intensely about the students' athletic performance but seemingly not at all about their education, living conditions, or other basic needs." (ECF No. 53 at 28.) But the UHSAA's proposed solution—to bar international students on F-1 visas from postseason competition—penalizes the victim of this abuse more than the perpetrator. The court recognizes the UHSAA's desire to destroy any incentives for abusive practices. But the UHSAA has not disqualified any coaches, schools, or teams who have perpetrated this abuse—coaches who, if these allegations are true, have no business coaching either national or international students. Instead, the UHSAA has limited the number and kind of athletic opportunities for international students in ways that these students would not necessarily choose. David, for instance, transferred from Juan Diego and attended his senior year at Corner Canyon High School. (Bengtzen Decl. ¶ 28.) Presumably, he played basketball there, as he is now playing basketball at a college in Texas. (Id.) It is not at all clear that David would have opted for a rule barring him from varsity play (or at least from postseason play) during his senior year.

The second government interest that the UHSAA asserts is its interest in ensuring fair competition for students in Utah—or, according to the Student Visa Eligibility Rule, for "Utah students." The court is less convinced that this objective, as stated, qualifies as a sufficiently important governmental interest. First, it is unclear exactly who counts as Utah students. Must a student live with their parents or other close family members to fit this definition? Is a student a Utah student if they transfer from another state to live with an aunt, a cousin, or a grandmother?

Second, fairness is a concept that eludes easy definition, as it is often in the eye of the beholder. Certainly, the UHSAA has an important interest in ensuring that its member schools abide by the same set of rules. But the UHSAA also has an important interest in ensuring that all students can participate. According to its Handbook, "[e]qual opportunity shall exist for all students to participate in Association sponsored activities without regard to sex, religion, race or ethnic origin."[8] (UHSAA Handbook, By-Laws Article 9 Section 1, ECF No. 54-19 at 58.) It is not, of course, the role of a federal court to instruct the UHSAA how to achieve the balance between fairness and inclusion in every situation. But where the UHSAA categorically excludes students from opportunities on the basis of their alienage, the court has the power to review whether such a rule is substantially related to the goals the UHSAA wishes to achieve.

The court finds that it is not. Essentially, the UHSAA attempts to solve a flood with a drought. The court agrees that the UHSAA has identified a potential problem of real concern: the illegal recruitment of international student athletes in violation of the UHSAA rules. But the evidence currently in the record concentrates on three possible recruitment violations: the LCA soccer team (made up mostly of Brazilian players), the LCA basketball team (made up mostly of international students), and the Juan Diego basketball team (whose composition is unclear, but

---

[8] "National origin" is notably absent from this list.

whose coach is the subject of several allegations of abuse).  It does not appear that the UHSAA has taken any specific action to discipline these infractions, in indeed these instances involve illegal recruitment.

The evidentiary record is necessarily sparser than the court would desire during an expedited TRO proceeding, a problem which will likely be lessened when the court considers whether it should issue a preliminary injunction.  But on this record, the court is unaware of how many students on F-1 visas currently attend high school in Utah, how many are credibly the subject of recruiting violations, and how many are credibly the subject of abuse.  The UHSAA may not yet have these answers either.  At the hearing on the TRO motion, Mr. Hammer testified that the investigation into potential abuses was ongoing.  The UHSAA suggests that the problem is extensive, but both Mr. Hammer and Coach Larson testified that poaching players—including the poaching of Utah players from one school by another—was also a widespread problem across Utah.  If schools are violating the UHSAA recruitment rules, they may be recruiting students from other parts of the state and other parts of the country, not just from abroad.

The UHSAA has addressed this issue with a rule relating to transfer students—but rather than applying this rule equally to both national and international transfer students, the UHSAA also adopted the Student Visa Eligibility Rule that applies only to international students.  While it may be more immediately obvious that a team is stacked with students from Brazil than with poached students from other schools in Utah, it is not clear on this record which problem is more extensive.

The UHSAA argues that it is difficult to police violations of its anti-recruitment policy because it lacks a subpoena power.  But the UHSAA Handbook includes a duty to report and cooperate (ECF No. 54-19 at 55) and the UHSAA may institute a wide range of penalties for

failure to comply.  The court is unconvinced that the UHSAA is powerless to act against the source of the problem: specific violations of its existing rules, for which the UHSAA could issue penalties and disqualifications that would serve as a warning to other schools.  Notably, the letter cited by the UHSAA from a lawyer representing over a dozen coaches that complains about the recruitment of international basketball players by LCA does not ask for restrictions against F-1 visa holders.  Instead, the letter asks the UHSAA to "consider the issue of LCA's eligibility for the 2024 state basketball tournament based on violations of the UHSAA Bylaws against recruiting."  (ECF No. 54-2 at 4.)  While there is no silver bullet to this issue, a more targeted approach would alleviate the constitutional concerns raised by a blanket prohibition on certain kinds of participation that applies to all students who fit a specific category of alienage, regardless of whether those students have violated the anti-recruitment rules already in place.  Indeed, other aspects of the Student Visa Eligibility Rule, such as a prohibition on coaching staff from serving as the host family for a student on an F-1 visa, are more specifically directed at the abuse the UHSAA wishes to prevent.  And as discussed below, other states have more narrowly tailored their eligibility rules to target specific recruitment concerns.

Finally, the evidence presented primarily concerns two schools and two sports: basketball and soccer.  There are no complaints about students recruited for any football programs, or any of the numerous other sports regulated by the UHSAA, including tennis, swimming, lacrosse, and others.  Accordingly, and while the court finds several important government objectives at play, there is insufficient evidence on this record to show that the Student Visa Eligibility Rule is substantially related to achieving the goals of the UHSAA.

### E.  Other States' Eligibility Rules for F-1 Students

The UHSAA relies in part on its Executive Director's assessment that "[m]any state high school associations across the country have rules that restrict or prohibit the participation of F-1 visa students in high school athletics," including high school associations in "California, Arizona, Nevada, Montana, Alaska, Idaho, Washington, and Oregon."  (Cuff Decl. ¶ 10; see also Emails re F-1 Visa Rules, ECF No. 54-5 (attaching these states' athletic associations' eligibility rules)).[9]  But as a whole, these eligibility rules demonstrate a more tailored approach that buttresses the court's finding that the UHSAA's Student Visa Eligibility Rule is overly restrictive and unconstitutionally discriminates on the basis of alienage.

Indeed, every one of the state rules referenced is less restrictive than the UHSAA rule, with two exceptions: 1) Arizona's rule, which (to the court's knowledge) has never been upheld on a constitutional challenge; and 2) Nevada's rule, which, as discussed below, has been challenged and appears to have been amended in practice.

Specifically, the California, Montana, Alaska, Idaho, Washington, Oregon. Hawaii, and Wyoming state athletic associations do not categorically bar F-1 students from varsity athletics. And to the extent there are limits on participation by F-1 visa holders, many of the athletic associations make exceptions available, through an appeals process or "hardship waiver."  For example, the Montana High School Association (MHSA) permits F-1 students to participate in two consecutive semesters of varsity athletics (ECF No. 54-5 at 14), and offers a hardship waiver to be examined by the MHSA Executive Director.[10]  The Alaska School Activities Association

---

[9] Mr. Cuff also attaches to his declaration the F-1 eligibility rules for Hawaii and Wyoming. (See ECF No. 54-5.)

[10] MHSA 2024 By-Laws, available at: cdn1.sportngin.com/attachments/document/0088/8550/3-By-Laws_2024..pdf?_gl=1*jdgwl3*_ga*MjQ5MjYwODA1LjE3MjkwMzcyMTc.*_ga_PQ25JN

(ASAA) bans F-1 visa students from "varsity, state qualifying and state championship competition for <u>one calendar year</u> from the date of first attendance in the new school unless there has been a bona fide move of parents."[11]  Where schools lack junior varsity teams, Alaska's F-1 students can seek a waiver to participate on the varsity team during the regular season without jeopardizing their team's postseason eligibility.[12]   In California, international students are granted varsity eligibility at all levels if they did not play that sport at another club or school team in the 12 months prior to their transfer, but are otherwise limited to junior varsity for their first 12 months.  (ECF No. 54-5 at 10.)  In Idaho, F-1 students are eligible for varsity play after one year's attendance and participation in junior varsity athletics.  (<u>Id.</u> at 2–3.)   In Oregon, international students on F-1 visa programs are "treated like a transfer student, except as provided in Rule 8.6.3.(c) for students on CSIET [Council on Standards for International Educational Travel] approved program."  (<u>Id.</u> at 5–6.)  Accordingly, non-CSIET students are eligible to participate in varsity athletics so long as they transfer over the summer, while CSIET students are eligible for one year of varsity play.  (<u>Id.</u>)  Oregon also provides F-1 students an appeals process before the state board's Executive Director.  Hawaii requires F-1 students to complete one year's play at the junior varsity level before varsity eligibility.  (<u>Id.</u> at 15.)  In Wyoming, students on valid F-1 and J-1 visas are eligible for varsity athletics.  (<u>Id.</u> at 13.)

In stark contrast, the Arizona Interscholastic Association currently bars F-1 visa students from varsity-level competition in all circumstances.  But as far as the court knows, this rule has

---

9PJ8*MTcyOTAzNzIxOC4xLjEuMTcyOTAzNzI2My4wLjAuMA..#_ga=2.65921582.1202440 139.1729037217-249260805.1729037217 (last accessed Oct. 17, 2024).

[11] ASAA 2024-2025 Handbook, available at: asaa.org/wp-content/uploads/handbook/2025handbook/asaa/complete/2024-2025-ASAA-Handbook.pdf (last accessed Oct. 17, 2024).

[12] <u>Id.</u>

never been subject to a constitutional challenge, and the absence of such a challenge in Arizona is in no way dispositive of the rule's constitutionality.

Indeed, the court notes that several of the state athletics associations' rules have been subject to successful constitutional challenges because they discriminate based on the students' national origin and immigration status.  For example, after the WIAA passed a regulation barring F-1 students from all varsity-level competition, a Washington state court granted a TRO on equal protection grounds, applying strict scrutiny.  See Fusato, 970 P.2d at 779 ("[F]or the WIAA to modify its rules to specifically discriminate against foreign exchange or I-20 VISA students in an attempt to make participation fairer for 'our students' establishes discriminatory purpose or intent"); ECF No. 54-5 at 12 (noting that, in Washington, F-1 visa students are considered transfer students for eligibility purposes).

And in Nevada, several students with F-1 visas sued the Nevada Interscholastic Activities Association (NIAA) on equal protection grounds after the NIAA barred F-1 visa students from varsity sports.  See Jutamas et al v. Nevada Interscholastic Activities Association, 3:20-cv-000288 (D. Nev. 2020).  The Jutamas plaintiffs voluntarily dismissed their case before a TRO was issued, but it is widely reported that a settlement was reached[13] in which the NIAA agreed to permit F-1 students to participate in varsity athletics and required the NIAA to rewrite its eligibility requirements.[14]

---

[13] McAndrew, Siobhan, Legal Battle To Allow International Students In Varsity Sports Not Over Despite Settlement, Reno Gazette Journal, February 20, 2020, available at: www.rgj.com/story/news/education/2020/02/20/niaa-excel-christian-athletes-nevada-high-school-international-students/4811374002/ (last accessed Oct. 17, 2024).  The NIAA rules available online have not been updated since 2021.

[14] The NIAA rules cited by Defendants and available on the NIAA website bar F-1 visa students, but not J-1 visa students, from participating in varsity athletics.  (ECF No. 54-5 at 11.)  But an Approved Regulation of the Nevada Legislature issued on June 8, 2020, and available on the Nevada State Legislature's website, appears to amend this rule, permitting participation by

As discussed above, the South Dakota District Court granted a preliminary injunction in a case concerning similar restrictions on the participation of students with an F-1 visa in varsity sports, finding a likelihood of success on the merits for a student's equal protection claim against the SDHSAA.  Entwistle, 2006 WL 8453556, at *4–5.  These outcomes involving similar athletic association rules bolster the strength of Mr. Szymakowski's claim.

Finally, the court notes that athletic associations in the western states of Oklahoma, Kansas, New Mexico, and Colorado do not effectively bar F-1 visa students from participating in varsity athletics.  In Oklahoma, all students with J-1 and F-1 visas are eligible to play varsity athletics.[15]  In Kansas, students on valid F-1 or J-1 visas in foreign exchange programs are eligible for full varsity-level participation for one year, and may apply for hardship exceptions beyond that.[16]  In New Mexico, F-1 students on CSIET programs are eligible to participate in varsity sports for one year.  F-1 students in New Mexico without a formal CSIET program are ineligible for varsity sports for their first year at the school.[17]  In Colorado, F-1 students in CSIET programs "shall have no more than three consecutive semesters of varsity eligibility beginning with his/her/their first varsity season."[18]  Colorado-based international students

---

students with F-1 visas in varsity athletics.  See §1, NRS 385B.060, available at: www.leg.state.nv.us/Register/2020Register/R019-20AP.pdf (last accessed Oct. 17, 2024).

[15] Oklahoma Secondary School Athletics Association (OSSAA) 2024-2024 Athletic Eligibility Guidelines, available at: ossaaillustrated.com/wp-content/uploads/2024/06/MF_2024-25_HardshipWaiverManual.pdf (last accessed Oct. 17, 2024).

[16] Kansas State High School Athletics Association 2024-2025 Handbook, available at: www.kshsaa.org/publications/handbook.pdf (last accessed Oct. 17, 2024).

[17] New Mexico Activity Association's Eligibility Bylaws, Section VI, available at: www.nmact.org/file/Section_6.pdf (last accessed Oct. 17, 2024).

[18] Colorado High School Activities Association (CHSAA) 2022-2023 By-Laws, available at: static.chsaanow.com/custompages/!!-2022-2023_BylawBook_RevisedSept29_2022.pdf (last accessed Oct. 17, 2024).

outside CSIET or some other verifiable educational exchange programs are not eligible for varsity sports participation.[19]

And while the UHSAA asserts that the Student Visa Eligibility Rule does not ban international students on F-1 visas from playing varsity sports, it certainly comes close. First, it is undisputed that students on F-1 visas cannot play varsity sports in the postseason. And if a student wishes to play varsity sports during the regular season, the entire school must either forfeit its shot at the playoffs and a state championship—certainly an unpopular choice—or opt to take independent status. The court is therefore unpersuaded that the Student Visa Eligibility Rule is relevantly distinct from a ban on varsity participation.

In sum, these state athletic association rules—many of which the UHSAA reviewed in crafting its policy limiting F-1 visa students' participation in athletics—provide less restrictive regimes to achieve the school district's stated goal to ensure international students' well-being and discourage inappropriate recruiting activities.

### F.  The Rule Poses Supremacy Clause Concerns

In addition to the equal protection concerns described above, the court is concerned that the rule may "conflict with … overriding national policies in an area constitutionally entrusted to the Federal Government." Graham, 403 U.S. at 378. While F-1 visa holders are subject to many restrictions, it is for Congress and not the UHSAA to impose those restrictions. If recruitment of foreign students solely for athletic purposes is as large a problem as the UHSAA fears, it may be appropriate for Congress to reconsider whether F-1 students should be restricted from varsity athletics or whether it makes sense to allow F-1 students to attend a private school for multiple years when the same student may only attend a public school for one year. The federal court

---

[19] Id.

must grant greater deference to congressional determinations about what restrictions are appropriate for various classes of immigrants and nonimmigrant aliens.

But the UHSAA's assertion that it is free to "impose[] additional burdens not contemplated by Congress," Toll, 458 U.S. at 13 (citation omitted), creates a slippery slope. Are schools free to impose other restrictions on international students, such as prioritizing citizens over non-citizens for admission to highly coveted AP courses? If an international student tries out for a school play, may that student play the role of Dorothy or are they limited to an appearance as a munchkin? Athletics is not the only field in which high schools compete with each other, and the court is wary of rules that deny opportunities to one class of students but not another on the grounds of the student's immigrant status—a determination that is more appropriately regulated by Congress.

### G. Conclusion

Due to these concerns under both the Equal Protection Clause and the Supremacy Clause, the court finds that Mr. Szymakowski has demonstrated a substantial likelihood that he will succeed on the merits of his claim.

## II.  Threat of Irreparable Harm

To establish irreparable harm, a plaintiff must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009). An ineffective monetary remedy is one in which "such damages would be inadequate or difficult to ascertain." Dominion Video Satellite, 269 F.3d at 1156. Mr. Szymakowski argues that he will suffer irreparable harm by being excluded from the remainder of his senior high school football season. While Mr.

Szymakowski has played some games this year at the junior varsity level, he is ineligible for postseason play under the Student Visa Eligibility Rule.

The Tenth Circuit has recognized that the deprivation of "individual rights" in violation of the Equal Protection Clause constitutes irreparable harm.  See Leachco, Inc. v. Consumer Prod. Safety Comm'n, 103 F.4th 748, 755 (10th Cir. 2024) (citing Free the Nipple-Fort Collins, 916 F.3d at 806); see also Elrod v. Burns, 427 U.S. 347, 373–74 (1976).  Because the court has found a substantial likelihood that the Student Visa Eligibility Rule poses an ongoing violation of Mr. Szymakowski's rights under the Equal Protection Clause, the court similarly finds that Mr. Szymakowski has made a strong showing of irreparable harm.

The court also finds that it would be difficult to determine appropriate monetary damages to compensate Mr. Szymakowski for the loss of his participation rights in postseason varsity athletics.  High school activities outside the four walls of the classroom, including activities as varied as sports, theater, language clubs, and student body government, are foundational parts of a high school experience.  Not every American high school offers the same activities and not every student chooses to pursue varsity sports.  But the freedom to join the activities offered by a high school on an equal footing with other students is a critical part of most Americans' secondary school experience.  Indeed, extracurricular activities build character, foster passion, require students to work together towards common goals, promote community, build friendships, and endow real world skills beyond what Mr. Szymakowski can learn in his AP chemistry class, even if those academic pursuits should be prioritized.

Further, as implicated here, a student's participation in many of these extracurricular activities, football especially, provides an undeniable leg-up in the college admissions process— in part because universities recognize that these programs provide well-rounded, well-adjusted

students, and in part because universities are permitted to recruit for athletics.  Here, the evidence demonstrates that Mr. Szymakowski's failure to compete with his high school football team at the varsity level could affect his chances of admission to American universities.  Coach Larson testified that, in his years of experience, a student athlete's game day performance on their high school team in varsity play is the single most critical factor for college scouts.  (Second Decl. Danny Larson ¶¶ 2–3, 6–11, ECF No. 61-1.)  The UHSAA provided no meaningful evidence or testimony to the contrary, instead insinuating that Mr. Szymakowski's self-promotion on social media and participation in football camps are possible alternative avenues for college recruitment.  Even if those opportunities are helpful, it does not mean that varsity games are unimportant.  Nor can Mr. Szymakowski's missed opportunity to play tonight be made up elsewhere at a later date.  For Mr. Szymakowski, his varsity season is fleeting—he is a senior with just one game left in the regular season.  Tonight's game and any postseason play are the last opportunities for Mr. Szymakowski to impress scouts in this singularly critical way.

In sum, the court recognizes that extracurricular experiences, including the right to participate in high school varsity football, provide a meaningful benefit to students through and beyond the college admissions process.  Mr. Szymakowski's loss of his opportunity to play, and the potential loss of college opportunities as a result, constitutes irreparable harm.

Nevertheless, the UHSAA asserts that any harm suffered by Mr. Szymakowski is self-inflicted because he delayed his request for injunctive relief until the close of the regular football season.  The Tenth Circuit has recognized that "delay in seeking preliminary relief cuts against finding irreparable injury."  Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1543–44 (10th Cir. 1994).

The court has carefully considered the timeline of events and the reasons why Mr. Szymakowski first asked for relief on October 7, 2024, rather than sometime during the summer. The court finds Mr. Szymakowski's assertion credible that, while he was aware the new rule could prevent him from playing at the varsity level, he believed that his coach was working with the UHSAA on a grandfather clause or other exception that would exempt him from the rule's application. When the football season began and there was still no exemption, Mr. Szymakowski then retained the services of a law firm to pursue his claims.

Mr. Szymakowski's counsel sent a demand letter by email to the UHSAA on September 10, 2024; the UHSAA replied on September 18, 2024; Mr. Szymakowski then filed his complaint and motion for a TRO on October 7, 2024. Although Plaintiff's counsel could have filed a request for injunctive relief sooner,[20] the court finds no evidence on this record that Mr. Szymakowski's own actions contributed to any delays. If anything, the delay suggests the difficulties that international students face when attempting to vindicate their rights in a foreign country—which is precisely the reason why the Supreme Court has considered aliens as a class a "prime example" of a "discrete and insular minority for whom … heightened judicial solicitude is appropriate." Graham, 403 U.S. at 372 (citation omitted). As the lead plaintiff in this case, Mr. Szymakowski will likely face accusations of unfairness and ingratitude. Indeed, he has already been subjected to a cross-examination in open court, which is rarely a pleasant experience. The court finds it unsurprising that Mr. Szymakowski's decision was not made lightly and may have taken some time.

---

[20] During a status conference on October 11, 2024, the court expressed its frustration that Plaintiff's counsel took over two weeks to prepare its motion but asked the court to require expedited briefing—or to issue a TRO without briefing—from the UHSAA. (Oct. 11, 2024 Hr'g Tr., ECF No. 52.)

Accordingly, the slight delay in this case does not obviate the court's finding that Mr. Szymakowski has demonstrated irreparable harm if the court does not enjoin the enforcement of the Student Visa Eligibility Rule as it applies to his participation on the varsity football team.

### III.   Balance of Equities

Having determined that Mr. Szymakowski will suffer irreparable injury absent the issuance of a TRO, the court now turns to a consideration of the harm that UHSAA will suffer if the court does issue the injunction.  The UHSAA argues that 1) the UHSAA would be harmed by the court's interference with its internal affairs; 2) other schools would be harmed if the court grants an exception to the rule solely for Mr. Szymakowski and Juan Diego; 3) the player that would be replaced on the field by Mr. Szymakowski would be harmed; and 4) the issuance of a TRO this late in the season would create a dangerous precedent encouraging other athletes to ask courts to make emergency eligibility determinations.

The court is unpersuaded by these arguments.  The UHSAA's first argument is merely an acknowledgment that any litigant appearing before the court may suffer harm from an adverse ruling.  Although a federal court does not step lightly into the affairs of a state organization, it is unequivocal that the federal court has the power to enjoin the enforcement of state laws and regulations that conflict with the Constitution.

The UHSAA's concern about fairness owed other schools is understandable and the court recognizes that a change to the rules issued mid-season will result in frustration and a feeling of unfairness.  But the UHSAA is free to mitigate the effects of the court's injunction.  Having now received a ruling from a federal court finding that the Student Visa Eligibility Rule suffers from serious constitutional defects, the UHSAA may voluntarily choose to enjoin the rule's application against all students and all schools until the court has resolved the conflict—in other

words, to continue this year's competitions as they would have been played last year, before the adoption of the new rule.

The court disregards the UHSAA's suggestion that it would be injured because Mr. Szymakowski would take the place of another punter. This allegation is merely an acknowledgment that every game is important to the students who participate in that game, a corroboration of Mr. Szymakowski's assertion that he will suffer irreparable harm if he is not allowed to play. But the decision about who should take the field should be based on the comparative merits of the participating students who are validly enrolled at a high school, not based on an athlete's country of origin or immigration status.

Finally, the court has already addressed the delay in this case and found that it was not caused by bad faith or an attempt to manipulate the court into a decision that it would not otherwise issue given more time to decide the issue with full briefing from the parties. Any risk that the issuance of a TRO would encourage other student athletes to ask for eleventh-hour eligibility determinations is outweighed by the risk of a different kind of precedent: that of a court that finds a likely constitutional violation but does not have the courage of its convictions to issue a remedy.

## IV.  Public Interest

For much the same reasons, the court finds that the public interest is best served by the issuance of a TRO. Mr. Szymakowski asks to be treated the same as non-foreign students who attend Juan Diego and other high schools across the state. The public is best served by a decision that upholds the equal protection of the laws to all persons who are lawfully within the state's jurisdiction.

**ORDER**

The court ORDERS as follows:

1.      The court GRANTS Mr. Szymakowski's Motion for a Temporary Restraining Order (ECF No. 2).

2.      The UHSAA is enjoined from enforcement of the Student Visa Eligibility Rule as it applies to Mr. Szymakowski during the remainder of the 2024 high school football season. Mr. Szymakowski may play in tonight's game without forfeiting Juan Diego's eligibility for postseason play.  The court finds no need for Mr. Szymakowski to provide security under Federal Rule of Civil Procedure 65(c).

3.      The court issues the following briefing schedule.  Any motion for a preliminary injunction must be filed by October 31, 2024.  Any response is due by November 13, 2024.  Any reply is due by November 20, 2024.

DATED this 17th day of October, 2024.

BY THE COURT:

Tena Campbell
United States District Judge