IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ZACHARY SZYMAKOWSKI, an individual; and JOHANNA URIBE, on behalf of FELIPE URIBE, a minor; on behalf of themselves and a proposed class of similarly situated F-1 students, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | Case No. 2:24-cv-00751-RJS |
| v. | Chief Judge Robert J. Shelby |
| UTAH HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., a Utah nonprofit corporation; ROBERT CUFF, an individual; MARILYN RICHARDS, an individual; AMBER SHILL, an individual; BURKE STAHELI, an individual; DAVID WARREN, an individual; DAVID LUND, an individual; ZACK MCKEE, an individual; PAUL SWEAT, an individual; LUKE RASMUSSEN, an individual; JERRE HOLMES, an individual; JASON SMITH, an individual; MIKE MEES, an individual; DEVIN SMITH, an individual; BRYAN DURST, an individual; and BRENT STRATE, an individual, | Magistrate Judge Cecilia M. Romero |
| Defendants. | |

Now before the court is Plaintiffs' Motion for Preliminary Injunction.[1]  Plaintiffs Zachary

Szymakowski and Felipe Uribe, through his mother Johana A. Uribe, and on behalf of a

proposed class of similarly situated individuals, ask the court to enjoin Defendant Utah High

School Activities Association (UHSAA) from enforcing a UHSAA rule limiting F-1 visa

---

[1] *See* Dkt. 79, *Motion for Preliminary Injunction* (*Motion*).

holders' eligibility for varsity athletics.[2]  For the following reasons, the court GRANTS

Plaintiffs' Motion.

## BACKGROUND

### I.  UHSAA's Function and Authority

UHSAA is the self-identified "Leadership Organization for Education-Based

Interscholastic Athletic and Performing Arts Activities" in the State of Utah.[3]  In this role,

UHSAA "administer[s] and supervise[s] interscholastic activities" among 159 public, charter,

and private member schools and more than 111,000 students.[4]  UHSAA promotes these activities

as "an essential part of the high school experience," and "a significant educational force in the

development of [the] skills needed to become a contributing member of society."[5]

UHSAA also promulgates "rules of eligibility" "to "create and maintain a unique variety

of high school sports competition."[6]  These rules govern student eligibility based on factors such

as "age, years of participation, academic progress, prohibition on the use of undue influence or

recruiting, initial enrollment, [and] transfers from one school to another."[7]  UHSAA does not

have subpoena power or an enforcement arm,[8] and the rules rest primary enforcement authority

---

[2] *Id.* at 1.

[3] *See* Dkt. 54-19, *Utah High School Activities Association 2024-2025 Handbook* (*UHSAA Handbook*) at 2.

[4] *Id.* at 2, 9, 60; Dkt. 55, *Declaration of Rob Cuff in Support of Opposition to Motion for TRO* (*Cuff Decl.*) ¶ 4.

[5] *UHSAA Handbook* at 2, 9.

[6] *Cuff Decl.* ¶ 6.

[7] *UHSAA Handbook* at 2, 9.

[8] Dkt. 95-2, *Declaration of Craig Hammer in Support of Opposition to Motion for Preliminary Injunction* (*Second Hammer Decl.*) ¶¶ 5–6.

with member school principals, athletic directors, coaches, and the like.[9]  But UHSAA is not

without enforcement authority.  "When [UHSAA] has information *suggesting* an infraction," it

may initiate an investigation or other "action as may be appropriate."[10]  And when UHSAA

"*determine[s]* that there has been a violation," it may "impose such penalties or fashion such

relief as may be proper."[11]  These penalties include, but are not limited to: issuing a reprimand

letter; placing a school, team, or individual's "continued participation" in UHSAA on

probationary status; suspending a school, team, or individual from participation in particular

activities; forfeiting a team or individual's "interscholastic athletic contest, title or

championship"; and imposing fines up to $1,500.00 per infraction.[12]  Additionally, the rules

require "[a]ll representatives and personnel of member schools" to "fully cooperate with the

Executive Director, [UHSAA's] Staff," and UHSAA's managing committees "to further the

objectives of the Association and its investigation and enforcement programs."[13]  UHSAA may

impose sanctions when a school fails "to report [an] infraction[] or respond fully and timely to

requests from [UHSAA] for information related to any enforcement matter or claimed [rule]

violation."[14]  These sanctions "may include suspension from participation by the school until

there is full compliance with the Association's requests."[15]

---

[9] *See UHSAA Handbook* at 54–55.  The rules make it the "duty" of school officials to "affirmatively . . . determine that all the participants under their jurisdiction who are to participate with and for the school are eligible."  *Id.* at 54. The rules likewise impose a "duty" on "[a]nyone who has knowledge or information that places in question the eligibility of any student" to "report such knowledge or information immediately to the principal or equivalent executive officer of the participant's school," and require the principal or equivalent executive officer to "immediately forward the information" to UHSAA's Executive Director.  *Id.*

[10] *Id.* at 55 (emphasis added).

[11] *Id.* (emphasis added).

[12] *Id.* at 55–56.

[13] *Id.* at 54.

[14] *Id.*

[15] *Id.*

UHSAA has never issued a penalty or taken any other enforcement actions against a player, coach, team, or school for recruiting violations involving a student on an F-1 visa.[16] However, UHSAA has a long record of using its enforcement authority to issue penalties for recruiting violations involving non-foreign students. As UHSAA's Executive Director Robert Cuff testified at an evidentiary hearing on the present Motion, UHSAA sanctioned six different public schools for violating its recruiting rules on seven different occasions between approximately 2008 and 2023. These sanctions took various forms—coach suspensions, vacated wins, and fines—but never involved sanctions against recruited students themselves.

## II.    F-1 Visas

F-1 visas are a form of non-immigrant visa issued by the United States federal government that allow aliens who meet certain criteria to enter the United States as full-time students.[17] For example, aliens must be "bona fide students qualified to pursue a full course of study," "enter the United States temporarily and solely for the purpose of pursuing such a course of study," "have a foreign residence, which they have no intention of abandoning," and "[h]ave sufficient funds available for self-support during the entire proposed course of study."[18]

Aliens must also enroll at federally certified academic institutions.[19] The federal government certifies a wide variety of individual institutions for this purpose—elementary schools, secondary schools, colleges, universities, seminaries, conservatories, language training programs, and others.[20] But the federal government does not certify public elementary or middle

---

[16] *See* Dkt. 79-1, *Transcript of Excerpt from Utah State Legislature Rules Review and General Oversight Committee Meeting on October 23, 2024* (*Rules Committee Transcript*) at 35:23–36:11.

[17] 8 U.S.C. § 1101(a)(15)(F)(i).

[18] U.S. Citizenship & Immigr. Servs, *Policy Manual*, vol. 2, pt. F, ch. 2 (2024).

[19] *Id.*

[20] *Id.*

4

schools for F-1 attendance, and restricts F-1 attendance at public high schools.[21]  An F-1 visa holder may not attend a public high school for an "aggregate period" of more than 12 months, and must "reimburse[] the local educational agency that administers the school for the full, unsubsidized per capita costs" of their education.[22]

### III.    Origins of the Student Visa Eligibility Rule

UHSAA's concerns about the practice of member schools recruiting international students with F-1 visas to play on their varsity athletic teams arose in approximately 2014.[23] Around that time, UHSAA observed "a concerning increase in F-1 students coming to private, Utah high schools."[24]  Specifically, UHSAA observed an "influx of F-1 players" to UHSAA member Wasatch Academy.[25]  The recruiting problem at Wasatch Academy was so substantial that UHSAA required Wasatch Academy to take "independent status."[26]

However, the UHSAA rule limiting F-1 visa students' participation in varsity athletics is the product of a more recent series of events.  In fall 2023, a UHSAA panel heard testimony from an F-1 student describing abuse he suffered while attending UHSSA member Juan Diego Catholic High School and playing on the Juan Diego varsity basketball team.[27]  The student testified he struggled academically, but Juan Diego teachers and administrators did not provide him help and artificially inflated his grades to maintain his academic eligibility for UHSAA

---

[21] *Id.* at vol. 2, pt. F, ch. 3.

[22] 8 U.S.C. § 1184(m)(1).

[23] *See* Dkt. 57, *Declaration of Craig Hammer in Support of Opposition to Motion for TRO* (*Hammer Decl.*) ¶ 4.

[24] *Id.*

[25] *Id.* ¶ 5. UHSAA believes this influx was due, at least in part, to the existence of "restriction on F-1 students in other western states."  *Cuff Decl.* ¶ 10.

[26] *Id.*  "Independent" member schools may compete against "full" member schools in pre-season and regular season competition, but "[a]re not post-season eligible" and do not have voting rights within UHSAA.  *UHSAA Handbook* at 61–62.

[27] *See Hammer Decl.* ¶ 6.

competition.[28]  He also testified coaches bullied him and administrators unfairly admonished him for minor offenses.[29]

Even more recently, in January 2024, UHSAA received a letter from a lawyer representing basketball coaches at several UHSAA member schools.[30]  The letter alleged that UHSAA member Layton Christian Academy (LCA) was pervasively recruiting students, "typically from foreign countries," for its varsity basketball team in violation of UHSAA rules.[31]  The lawyer wrote that, at the time, LCA's team included "15 players from 12 different countries," and its starting lineup "consiste[d] of players from Brazil, France, Serbia, Burundi East Africa, and Las Vegas."[32]  The lawyer also directed UHSAA to the website of a youth basketball organization in the United Kingdom called "Ballers Heaven."[33]  The lawyer reported the website advertised Ballers Heaven's relationship with LCA, including the availability of LCA scholarships to Ballers Heaven players.[34]  Finally, the letter asked UHSAA to convene a panel to discuss barring LCA's basketball team from participating in the upcoming state championship as a penalty for LCA's recruiting violations.[35]

Based on the Juan Diego student's testimony and the allegations contained in the letter, UHSAA commenced a broad investigation into the statewide practice of member schools

---

[28] Id.

[29] Id.  KSL News reported these allegations, as well as similar allegations concerning other F-1 students on Juan Diego's basketball team.  Dkt. 54-4, Hosts Question 'Scholarships' for International Students Playing Utah Sports; UHSAA Investigating.

[30] Hammer Decl.  ¶ 7.

[31] See Dkt. 54-2, Letter Re: Layton Christian Academy Participation in 4A State Basketball Tournament at 3.

[32] Id.

[33] Id.

[34] Id. at 3–4.

[35] Id. at 4.

recruiting and mistreating F-1 students.[36]  The investigation quickly revealed additional evidence

that certain member schools were recruiting international students for varsity athletics and failing

to care for those students when they arrived in the United States.[37]  For example, UHSAA

obtained an email from a former Juan Diego counselor alleging that Juan Diego staff directed her

to submit false information to UHSAA regarding an international student's academic

eligibility.[38]  UHSAA likewise obtained emails from two Juan Diego parents alleging

widespread "educational dysfunction" at Juan Diego.[39]  The parents reported several concerns

regarding Juan Diego's treatment of international student athletes.  First, they reported that

between 2018 and 2019, a Juan Diego basketball coach asked them to host an international

student who was coming to Juan Diego "to be a part of the basketball team and on full

scholarship."[40]  They reported that after they declined to host the student, the school enlisted

several other families to house him before eventually paying for the student, a minor, to live on

his own in an apartment.[41]  Second, the parents reported an incident in which the basketball

coach invited members of the basketball team to look at pictures of "potential players" from Mali

and asked the team members "which one they should try and get."[42]  Third, the parents reported

that when a student from Mali came to Juan Diego the following fall, the school did not offer

him any academic or personal support.[43]  Fourth, the parents reported facts consistent with the

---

[36] *Hammer Decl.* ¶¶ 7–8.

[37] *See id.* ¶¶ 9–12; *Cuff Decl.* ¶ 11.

[38] *See* Dkt. 54-3, *Email Re: UHSAA Letter.*

[39] *See* Dkt. 54-6, *Email Re: Juan Diego – Issues with International Student Athletes*.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

story of the F-1 student who testified at a UHSAA panel that Juan Diego mistreated him.[44]  And fifth, the parents reported the basketball coach was generally aggressive, disrespectful, and threatening towards international students, "treat[ing] them like property and dehumanize[ing] them."[45]

As part of its investigation, UHSAA also obtained screenshots of websites and social media posts wherein "Ballers Heaven," a Brazilian youth soccer organization called "Rio Brazil," a Tahitian sports academy called "Tamari'I Maohi Sports Élite," a Chilean basketball academy called "George Perez - Utah Basketball Academy," and several other youth sports organizations advertised partnerships and scholarship opportunities with Wasatch Academy, LCA, Juan Diego, and two additional UHSAA members—Judge Memorial Catholic High School and St. Joseph's Catholic High School. [46]  UHSAA also observed that the numbers of F-1 students at certain schools were overwhelming.[47]  During the 2023–2024 school year, for example, 37 out of 38 students on LCA's boys' soccer team were F-1 students.[48]

In spring 2024, UHSAA began studying ways to combat international recruiting, and the related problem of international student athlete mistreatment.  Believing the issue to be unique to students with F-1 visas, which allow students to attend the private high schools of their choice

---

[44] *Id.*

[45] *Id.*

[46] *Hammer Decl.* ¶ 12; *see also* Dkt. 54-1, *Email Re: LCA* (quoting Ballers Heaven's website); Dkt. 54-8 (compilation of evidence regarding George Perez Utah Basketball Academy); Dkt. 54-9 (Baller's Heaven statement regarding LCA's state championship win); Dkt. 54-12 (compilation of Evidence Regarding Tamari'I Maohi Sports Élite); Dkt. 54-13 (Baller's Heaven image promoting player's commitment); Dkt. 54-14 (compilation of Instagram posts promoting international players' commitments to LCA); Dkt. 54-15 (compilation of evidence regarding Rio Brazil); Dkt. 54-16 (further compilation of evidence regarding international recruiting); Dkt. 54-18 (testimonials from Baller's Heaven's website).

[47] *See Cuff Decl.* ¶¶ 13–14, 17.

[48] *See id.* ¶ 13.

for full four-year programs,[49] Cuff reached out to high school activities associations in neighboring states about their eligibility rules for F-1 students.[50]  Cuff provided these rules to UHSAA's Constitution and Bylaws Committee and the Committee, led by Chair Craig Hammer, began drafting a rule of its own for F-1 students.[51]  The Committee approved the draft rule at a March 21, 2024 meeting,[52] the UHSAA Board of Trustees discussed the proposed rule at a March 28, 2024 meeting,[53] and the UHSAA Executive Committee heard public comment from representatives of LCA, Juan Deigo, and Judge Memorial Catholic High School on the rule at an April 24, 2024 meeting.[54]  The UHSAA Board of Trustees approved the rule at a May 1, 2024 meeting,[55] and UHSAA members subsequently ratified the rule by a 128 to 9 vote, with 19 schools not responding.[56]  This procedure made the rule, titled the Student Visa Eligibility Rule, effective for the 2024–2024 school year.[57]

The challenged portion of the Student Visa Eligibility Rule appears in UHSAA's 2024–2025 Handbook at *Interps & Guidelines 1.9.3(B)(1)* and reads as follows:

> An international student with an F-1 visa issued by the U.S. Immigration and Naturalization Service is a student who attends high school in the U.S.  An international student with an F-1 visa is only eligible for non-varsity level competition unless the following condition is met: a member school may choose to compete with an [F-1] student at the varsity level, but the member school is not

---

[49] *Hammer Decl.* ¶ 13; *Cuff Decl.* ¶¶ 10, 14–15, 35.  UHSAA is not concerned that other forms of student visas are contributing to the student recruiting and student mistreatment problems because other visas do not allow international students to attend the high school of their choice for four years.  *Cuff Decl.* ¶ 18.  For example, J-1 visas only allow international students participating in exchange programs to attend high school in the United States for up to one year.  *Id.*; *see also* U.S. Citizenship & Immigr. Servs., *Policy Manual*, vol. 2, pt. D, ch. 3 (2024).

[50] *Hammer Decl.* ¶¶ 13–14; Dkt. 54-5, *Email re: F1 Students*.

[51] *Hammer Decl.* ¶¶ 14–15; *Cuff Decl.* ¶¶ 22–23.

[52] *Hammer Decl.* ¶ 15; *Cuff Decl.* ¶ 23.

[53] *Hammer Decl.* ¶ 16; *Cuff Decl.* ¶ 24.

[54] *Hammer Decl.* ¶ 17; *Cuff Decl.* ¶¶ 25.

[55] *Cuff Decl.* ¶ 26.

[56] *Id.* ¶ 27.

[57] *Id.* ¶ 28.

> eligible for post-season competition.  Such member school must declare the use of
> an [F-1] student at the varsity level prior to the competition start date for that given
> sport and receive approval from the UHSAA.[58]

A forward to the Student Visa Eligibility Rule's text adds that the Rule seeks to address "the

concerns of [UHSAA] member schools related to displacement of Utah students by students

from foreign countries as well as recruiting of foreign players to be placed with Utah high

schools," and is intended "to preserve interscholastic competitive opportunities for Utah students

and promote the unique competition fostered by the UHSAA."[59]

## IV.   The Student Visa Eligibility Rule's Effect on Students

In the months the Student Visa Eligibility Rule has been in effect, it has tangibly

impacted international students attending school in Utah on F-1 visas.  For example, Plaintiff

Zachary Szymakowski is an 18-year-old Australian citizen, F-1 visa holder, and a senior at Juan

Diego.[60]  He enrolled at Juan Diego in fall 2023—a year after choosing to attend the school

based on its "excellent record of student success in both academic and athletic achievement,"

Catholic affiliation, and experience hosting international students.[61]  The school did not recruit

him,[62] and he has realized considerable academic, extra-curricular, and social success in his time

as a student.  He has received college credit in several subjects,[63] served as one of eight elected

---

[58] *Id.* ¶ 30; *see also UHSAA Handbook* at 37.  The Student Visa Eligibility Rule imposes several additional requirements on F-1 students' ability to participate in UHSAA-sponsored competition at *Interps & Guidelines 1.9.3(B)(2)–(7)*, but Plaintiffs do not challenge these requirements.  The Student Visa Eligibility Rule likewise permits J-1 visa holders to compete in varsity athletics if they satisfy UHSAA's standard eligibility requirements, excepting a UHSAA rule limiting a student's eligibility after a school-to-school transfer, at *Interps & Guidelines 1.9.3(A)*.  And permits other non-citizen students to compete in varsity athletics if they satisfy UHSAA's standard eligibility requirements at *Interps & Guidelines 1.9.3(C)*.  But Plaintiffs do not challenge these sections of the Rule.

[59] *UHSAA Handbook* at 37.

[60] Dkt. 2-1, *Declaration of Zachary Szymakowski* ¶¶ 1–6.

[61] *See id.* ¶¶ 8–11.

[62] *Id.* ¶ 7.

[63] *Id.* ¶¶ 15–16.

student body representatives,[64] and built positive relationships with members of the Juan Diego community.[65]

Szymakowski has also realized considerable athletic success.  During the 2023–2024 school year, he tried out and made Juan Diego's varsity football team, serving as the team's punter for nine out of ten games.[66]  He also tried out and made Juan Diego's varsity track and field team, competing in several events before he suffered a season-ending injury.[67]  However, the Student Visa Eligibility Rule made Szymakowski ineligible to compete for Juan Diego's varsity football team during the fall 2024 season,[68] and will make him ineligible to compete for Juan Diego's varsity lacrosse team during the spring 2025 season.[69]

As a second example, Plaintiffs allege Felipe Uribe is a 17-year-old Colombian citizen, F-1 visa holder, and junior at St. Joseph's Catholic High School in Ogden, Utah.[70]  Plaintiffs allege Uribe enrolled at St. Joseph's in fall 2023.[71]  Plaintiffs allege Uribe's parents sent him to St. Joseph's because "the educational curriculum and experiences" available to him in Utah were better than those in Colombia, he could live with extended family, and his sister had a positive

---

[64] *Id.* ¶ 17.

[65] *Id.* ¶¶ 11–12, 20.

[66] *Id.* ¶¶ 18–19.

[67] Dkt. 104–1, *Declaration of Zachary Szymakowski in Support of Plaintiffs' Motion for Preliminary Injunction* (*Third Szymakowski Decl.*) ¶¶ 3–6.

[68] Dkt. 2-2, *Declaration of Danny Larson* ¶¶ 6–11.  Danny Larson, Juan Diego's football coach, felt "[he] could not, in good conscience," allow Szymakowski to play when doing so "penalize[d] the other members of the football team by forfeiting their opportunity to compete in post-season play."  *Id.*  ¶ 12.  However, as described in the following section, the court entered a Temporary Restraining Order enjoining the Student Visa Eligibility Rule such that Szymakowski was able to play in the final two varsity football games of the 2024 season without compromising Juan Diego's post-season eligibility.

[69] *See Third Szymakowski Decl.* ¶¶ 8–12.

[70] Dkt. 108, *Second Amended Complaint* ¶¶ 9, 78.

[71] *Id.* ¶ 85.

experience as a St. Joseph's student from 2012–2016.[72]  Plaintiffs allege he was not recruited to St. Joseph's.[73]  Plaintiffs also allege Uribe has achieved considerable academic and athletic success at St. Joseph's.  They allege he has a 3.9 grade point average and that he played on St. Joseph's varsity basketball team during the 2023–2024 school year.[74]  Like Szymakowski, however, Plaintiffs allege the Student Visa Eligibility Rule makes Uribe ineligible to compete for St. Joseph's varsity basketball team during the winter 2024–2025 season,[75] and will make him ineligible to compete for St. Joseph's varsity soccer team this spring.[76]

## PROCEDURAL BACKGROUND

### I.   Plaintiffs' Original Complaint and Motion for Temporary Restraining Order

Szymakowski initiated this lawsuit on October 7, 2024 when he filed a proposed class action Complaint asserting three claims for relief: (1) alleging the Student Visa Eligibility Rule violates the Fourteenth Amendment's Equal Protection Clause, (2) alleging the Rule discriminates against F-1 students in violation of Title VI of the Civil Rights Act, and (3) seeking a declaratory judgment that the Rule violates the Supremacy Clause.[77]  The same day, he moved for a Temporary Restraining Order (TRO) enjoining UHSAA from enforcing the Rule against

---

[72] *Id.* ¶¶ 79–83.

[73] *Id.* ¶ 84.

[74] *Id.* ¶¶ 88, 91–92.

[75] *Id.* ¶¶ 93–95.

[76] *Id.* ¶ 4.  The foregoing allegations regarding Uribe are drawn from Plaintiffs' Second Amended Complaint.  The record does not contain any direct evidence supporting the allegations.  However, the allegations are generally consistent with the evidence regarding the Student Visa Eligibility Rule's impact on Szymakowski's inability to compete in varsity athletics, as well as UHSAA's representations regarding the Rule.  And UHSAA's Opposition to Plaintiffs' Motion neither disputes the allegations nor argues the court should decline to consider them for purposes of deciding the Motion.

[77] Dkt. 1, *Complaint* ¶¶ 101–128.  Prior to bringing suit, Szymakowski asked UHSAA to exempt him from the Student Visa Eligibility Rule, and Szymakowski's counsel sent UHSAA a demand letter explaining Szymakowski's concerns with the Rule.  *See* Dkt. 2-3, *Letter Re: UHSAA's Rule Restricting F-1 Visa Students from Participating in Varsity Sports* (*Demand Letter*).

him for the duration of his 2024 high school football season.[78]  Szymakowski argued he was substantially likely to succeed on the merits of his Equal Protection Clause claim, he would suffer irreparable harm absent a TRO, this harm outweighed any harm a TRO would cause USHAA, and a TRO was in the public interest.[79]

Due to a scheduling conflict, the undersigned asked Judge Tena Campbell to preside over the TRO Motion.[80]  Judge Campbell agreed and oversaw an October 16, 2024 evidentiary hearing on the Motion.[81]  Judge Campbell also issued an October 17, 2024 Order and Memorandum Decision granting Szymakowski's Motion and enjoining UHSAA from enforcing the Student Visa Eligibility Rule as to Szymakowski for the remainder of the football season.[82]  Although Judge Campbell issued her TRO ruling on short notice, she provided a detailed and comprehensive analysis of the issues before her.

## II.   Plaintiffs' Motion for Preliminary Injunction and Subsequent Developments

On October 31, 2024, Plaintiffs filed the present Motion—an effort to build on the TRO by requesting an order enjoining UHSAA from enforcing the Rule as it relates to all F-1 students across all sports for the remainder of this litigation.[83]  UHSAA filed an Opposition on November 13, 2024,[84] and Plaintiffs filed a Reply on November 20, 2024.[85]  The court heard evidence and oral argument concerning the Motion at a November 27, 2024 hearing.[86]

---

[78] See Dkt. 2, *Motion for Temporary Restraining Order and Preliminary Injunction*.

[79] *Id.* at 6–17.

[80] See Dkt. 52, *Transcript of Zoom Status Conference held on October 11, 2024*.

[81] See Dkt. 67, *Minute Entry for Motion Hearing Held on 10/16/2024*.

[82] See Dkt. 69, *Order and Memorandum Decision Granting Temporary Restraining Order* (*TRO Decision*).

[83] See *Motion*.

[84] See Dkt. 95, *Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction* (*Opposition*).

[85] See Dkt. 104, *Reply in Support of Motion for Preliminary Injunction* (*Reply*).

[86] See Dkt. 110, *Minute Entry for Motion Hearing Held on 11/27/2024*.

Several noteworthy events occurred while briefing on Plaintiffs' Motion was underway. First, on November 1, 2024, Juan Diego lost in the UHSAA playoffs,[87] ending Szymakowski's 2024 high school football season and rendering the TRO moot. Second, on November 8, 2024, Plaintiffs filed their First Amended Complaint.[88] The First Amended Complaint was substantially similar to the original Complaint but added Uribe as a Plaintiff. And third, on November 12, 2024, Defendants filed a Motion to Dismiss the Amended Complaint.[89] Defendants argued the end of the football season mooted Szymakowski's claims, and Uribe lacked capacity to sue.[90] In an oral ruling delivered at the November 27, 2024 hearing, the court denied Defendants' Motion. Nevertheless, the court ordered Plaintiffs to file a Second Amended Complaint adding Uribe's mother, Johanna Uribe, as a named Plaintiff and legal representative of her minor son. Plaintiffs did so the same day.[91]

Plaintiffs' Motion for Preliminary Injunction is ripe for review.[92]

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 enables the court to issue a preliminary injunction. To obtain an injunction under Rule 65, a plaintiff must establish four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

---

[87] Plaintiffs and Defendants discussed Juan Diego's loss at a November 4, 2024 status conference. *See* Dkt. 80, *Minute Entry for Status Conference Held on 11/4/2024*.

[88] *See* Dkt. 82, *First Amended Complaint*.

[89] *See* Dkt. 86, *Motion to Dismiss Plaintiffs' First Amended Complaint*.

[90] *Id.* at 4–6.

[91] *See* Dkt. 108, *Second Amended Complaint*.

[92] On November 18, 2024, Defendants Robert Cuff, Marilyn Richards, Amber Shill, Burke Staheli, David Warren, David Lund, Zack Mckee, Paul Sweat, Luke Rasmussen, Jerre Holmes, Jason Smith, Mike Mees, Devin Smith, Bryan Durst, and Brent Strate filed a Motion to Dismiss the Amended Complaint. *See* Dkt. 102, *Motion to Dismiss Individual Defendants*. The court will consider this Motion at a later date because Plaintiffs' Motion for Preliminary Injunction requests only injunctive relief with respect to Defendant UHSAA. *See Motion* at 1.

the public interest."[93]  The likelihood of success on the merits and irreparable harm factors are "the most critical" of the four.[94]

In every case, a preliminary injunction is "an extraordinary remedy" and a plaintiff's "right to relief must be clear and unequivocal."[95]  In certain cases, however, a plaintiff faces the additional burden of making a "strong showing" that the likelihood of success on the merits and balance-of-harms factors weigh in their favor.[96]  This heightened standard applies in the Tenth Circuit when a plaintiff seeks a "disfavored" injunction.[97]  A disfavored injunction is one that (1) "mandates action (rather than prohibiting it)," (2) "changes the status quo," or (3) "grants all the relief that the moving party could expect from a trial win."[98]  The Tenth Circuit defines the "status quo" as "the last peaceable uncontested status existing between the parties before the dispute developed."[99]  And the Tenth Circuit considers an injunction to "fall into the all-the-relief category only if its effect, once complied with, cannot be undone."[100]  "[I]f the court 'probably can put the toothpaste back in the tube,' then the heightened standard does not apply."[101]

---

[93] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[94] *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[95] *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 752 (10th Cir. 2024) (quoting *Schrier v. Univ. of Colo.*, 427 F.3d 1258, 1258 (10th Cir. 2005)).

[96] *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016).

[97] *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).

[98] *Id.*

[99] *Id.* at 798 n.3 (quoting 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948 (3d. ed. & Nov. 2018 update)).

[100] *Id.* (citations and internal quotation marks omitted).

[101] *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 (D. Utah 2020) (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3).

## ANALYSIS

Judge Campbell's Memorandum Decision provides a natural starting point for analyzing the present Motion for three reasons.  First, Judge Campbell's ruling and Plaintiffs' Motion engage the same principal legal issues: (1) whether a request for an injunction barring UHSAA from enforcing the Student Visa Eligibility Rule is a disfavored injunction; (2) whether it is substantially likely the Student Visa Eligibility Rule violates the Equal Protection and/or Supremacy Clause; (3) whether an aspiring varsity athlete subject to the Student Visa Eligibility Rule would suffer irreparable harm absent an injunction prohibiting UHSAA from enforcing the Student Visa Eligibility Rule; (4) whether this harm would outweigh any harm to UHSAA; and (5) whether an injunction prohibiting UHSAA from enforcing the Student Visa Eligibility Rule is in the public interest.  Second, Judge Campbell's ruling and Plaintiffs' Motion rely on an overwhelmingly common set of facts.  And third, upon review of the record and relevant legal authority, the court agrees with Judge Campbell's careful and persuasive analysis.

Accordingly, the court proceeds by adopting and incorporating Judge Campbell's analysis save only for UHSAA's offer of new or different legal authority, presentation of new or different evidence, and UHSAA's argument that Judge Campbell erred in her decisionmaking. Ultimately, the court finds Plaintiffs have again established their right to preliminary injunctive relief.[102]

### I.    Applicable Legal Standard

The court finds the Motion does not request a disfavored injunction and is not subject to the heightened standard of review described above.  On this issue, Judge Campbell concluded an

---

[102] For the reasons articulated in the court's November 27, 2024 oral ruling, the court rejects UHSAA's argument that this case is moot, *see Opposition* at 14–15, and proceeds directly to the merits.

injunction barring UHSAA from enforcing the Student Visa Eligibility Rule was not disfavored because it was prohibitory in nature.[103]   She also determined an injunction preserved the status quo—properly defined as of the day before UHSAA adopted the Student Visa Eligibility Rule—and did not afford Szymakowski all the relief he could expect from a trial win because it would provide only temporary relief.[104]   Plaintiffs urge the instant Motion does not seek a disfavored injunction for the same reasons,[105] but UHSAA maintains the injunction is disfavored because it would provide Plaintiffs "substantially all the relief they could get at trial."[106]   In support of this argument, UHSAA reasons Szymakowski already "received substantially all the relief he could have obtained from a full trial" by being allowed to "play out his senior season" and "it is almost guaranteed that Uribe will graduate long before this case can be tried."[107]   UHSAA further reasons that among the proposed class, "even . . . freshmen are highly unlikely to see this case tried in their less-than-four years before graduation."[108]

UHSAA misapplies the "all-the-relief" category of disfavored injunctions.  As Judge Campbell explained in her TRO ruling, "[t]he Tenth Circuit does not consider an injunction disfavored 'simply because the plaintiff would get no additional relief if he prevailed at the trial on the merits.'  Rather, the Tenth Circuit looks to whether an injunction would 'render a trial on the merits largely or completely meaningless.'"[109]   And as was the case with Szymakowski's TRO, the requested preliminary injunction would not "render a trial meaningless because it

---

[103] *TRO Decision* at 9.

[104] *Id.* at 10–11.

[105] *Reply* at 2–3.

[106] *Opposition* at 36.

[107] *Id.*

[108] *Id.*

[109] *TRO Decision* at 10.

would provide [Plaintiffs] only *temporary* relief from the Student Visa Eligibility Rule."[110]

"UHSAA could still prevail at trial and enforce the [R]ule . . . in subsequent athletic seasons."[111]

The potentially slow pace of federal litigation does not change the result.  UHSAA's argument in this respect is that this case will inevitably become moot because any potential class representative will graduate before a trial can take place.  But the court will not so speculate,[112] and it defies fairness to restrict Plaintiffs' access to preliminary relief based on the court's own potential docket limitations.  Federal litigation sometimes moves slowly because courts are tasked with fully and fairly adjudicating the often-complex issues before them, while balancing heavy caseloads and numerous other responsibilities.  These inconveniences are neither Plaintiffs' failing nor an excuse for UHSAA to evade judicial review of its allegedly unconstitutional policy.[113]

The court concludes Plaintiffs' requested injunction is not disfavored and, like Judge Campbell, reviews Plaintiffs' Motion under the ordinary preliminary injunction standard.

## II.    Likelihood of Success on the Merits

To begin, the court finds Plaintiffs have shown they are substantially likely to succeed on both their Equal Protection and Supremacy Clause claims.

---

[110] *Id.* at 10.

[111] *Id.*

[112] It is likely the court will resolve summary judgment motions, conduct a trial, and/or take up class certification within the next four years.  It is also possible Plaintiffs will establish that the proposed class is exempt from the mootness doctrine under the "inherently transitory" exception to the general rule that an uncertified class's claims become moot when a named plaintiff's claims become moot.  *See, e.g. Fisk v. Bd. Trs. of Cal. State Univ.*, No. 22-CV-173 TWR (MSB), 2023 WL 6051381, at *11 (S.D. Cal. Sept. 15, 2023) (citing *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011)) (explaining that the inherently transitory exception applies when the nature of a case is such that "the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires").

[113] *C.f. Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013) (explaining that one purpose of the inherently transitory exception is to avoid situations in which "the transitory nature of the conduct giving rise to [a] suit" enables a defendant to "effectively insulate [their] conduct from review").

### A. Equal Protection Clause

Judge Campbell found Szymakowski was substantially likely to succeed on the merits of his Equal Protection Clause Claim based on her conclusions that UHSAA is a state actor, the Student Visa Eligibility Rule treated Szymakowski differently based on his alienage, alienage classifications are unlawful unless they satisfy strict scrutiny, and UHSAA could not show the Student Visa Eligibility Rule survived any form of heightened scrutiny.[114]  Plaintiffs' Motion for Preliminary Injunction argues they are substantially likely to succeed on the merits of their Equal Protection Clause claim for substantially the same reasons,[115] and UHSAA does not dispute it is a state actor subject to the Equal Protection Clause.[116]  Arguing Judge Campbell erred in her assessment of what standard of review to apply, however, UHSAA contends Plaintiffs will not succeed on the merits of their Equal Protection Clause claim because the Student Visa Eligibility Rule treats Plaintiffs differently based only on a subset of alienage—nonimmigrant alien status— and classifications discriminating against nonimmigrant aliens vis-à-vis immigrant aliens and citizens are lawful if they satisfy rational basis review.[117]  UHSAA thus argues the facts in the record show Plaintiffs will not succeed on the merits of their Equal Protection Clause claim because the Student Visa Eligibility Rule withstands rational basis review, and in the alternative that the Rule survives even heightened and strict scrutiny.[118]

---

[114] *See TRO Decision* at 11–31.

[115] *See Motion* at 9–18.

[116] *See Opposition* at 16–25.

[117] *Id.* at 16–21.  "There are two categories of U.S. visas: immigrant and nonimmigrant.  Immigrant visas are issued to foreign nationals who intend to live permanently in the United States.  Nonimmigrant visas are for foreign nationals wishing to enter the United States on a temporary basis – for tourism, medical treatment, business, temporary work, study, or other similar reasons."  *Requirements for Immigrant and Nonimmigrant Visas*, U.S. Citizenship & Immigration Services (Mar. 14, 2024), https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas.

[118] *Opposition* at 21–25.

### 1. Level of Review

As an initial matter, the court agrees with Judge Campbell that the Student Visa Eligibility Rule is subject to strict scrutiny.  As Judge Campbell explained, the Equal Protection Clause of the Fourteenth Amendment provides that a state actor may not "deny to any person," including non-citizen aliens, "the equal protection of its laws.'"[119]  And Supreme Court precedent presumes most state laws violate this provision when they "classify by race, alienage, or national origin."[120]  Accordingly, the Court has long-subjected such laws to strict scrutiny, sustaining them "only if they are suitably tailored to serve a compelling state interest."[121]

As Judge Campbell also explained, Supreme Court precedent establishes two exceptions to this rule, and decisions from the Fifth and Sixth Circuits support a possible third exception. First, Supreme Court precedent contains a narrow exception for state laws that exclude aliens from civic roles involving political and governmental functions.[122]  Such laws do not violate the Equal Protection Clause as long as they satisfy rational basis review.[123]  Second, Supreme Court precedent contains an exception for state laws that deny certain opportunities and benefits to undocumented aliens.[124]  Even so, in *Plyler v. Doe*, the Court subjected such a law to heightened scrutiny.[125]  And third, in *LeClerc v. Webb* and *League of United Latin American Citizens*

---

[119] *TRO Decision* at 12–13 (first quoting U.S. Const. amend. XIV, § 1; then citing *Plyler v. Doe*, 457 U.S. 202, 215 (1982); and then citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 413 (1948)).

[120] *Id.* at 13–14 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); then citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971); then citing *Nyquist v. Mauclet*, 432 U.S. 1, 12 (1977); then citing *Sugarman v. Dougall*, 413 U.S. 634, 642–43 (1973); then citing *In re Griffiths*, 413 U.S. 717, 721–22 (1973); and then citing *Examining Bd. Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 601–06 (1976)).

[121] *Id.*

[122] *Id.* at 15 (citing *Foley v. Connelie*, 435 U.S. 291, 295–96 (1978); then citing *Ambach v. Norwick*, 441 U.S. 68, 81 (1979); then citing *Cabell v. Chavez-Salido*, 454 U.S. 432, 447 (1982); and then citing *Bernal v. Fainter*, 467 U.S. 216, 220–21 (1984)).

[123] *Id.*

[124] *Id.* at 15–16 (citing *Plyler*, 457 U.S. at 219; then citing *De Canas v. Bica*, 424 U.S. 351 (1976)).

[125] *Id.*

(LULAC) v. Bredesen, the Fifth and Sixth Circuits recognized an exception for state laws that discriminate based on nonimmigrant alien status.[126]  Distinguishing nonimmigrant aliens, who are lawfully permitted to reside in the United States *temporarily*, from immigrant aliens, who are lawfully permitted to reside in the United States *permanently*, both courts held that such laws do not violate the Equal Protection Clause as long as they satisfy rational basis review.[127]  But, as Judge Campbell persuasively reasoned, a comprehensive assessment of the relevant law weighs against following the Fifth and Sixth Circuit's additional exception.[128]

UHSAA's challenge to Judge Campbell's conclusion that the Student Visa Eligibility Rule triggers strict scrutiny concerns this additional exception.  Specifically, UHSAA argues Judge Campbell improperly relied on the Second Circuit's competing decision in *Dandamudi v. Tisch*.[129]  In *Dandamudi*, the Second Circuit expressly declined to follow *LeClerc* and *LULAC*, reasoning the Supreme Court had "never distinguished between classes of *legal* resident aliens."[130]  The Second Circuit instead concluded strict scrutiny applied to a New York law

---

[126] *Id.* at 16 (citing *LeClerc v. Webb*, 419 F.3d 405, 410–11, 415 (5th Cir. 2005); then citing *League of United Latin Am. Citizens (LULAC) v. Bredesen*, 500 F.3d 523, 526, 533 (6th Cir. 2007)).

[127] *Id.*

[128] *Id.* at 16–22 (citing *Dandamudi v. Tisch*, 686 F.3d 66, 74, 78 (2d Cir. 2012); then citing *Plyler*, 457 U.S. at 219; then citing *Graham*, 403 U.S. at 377; then citing *LeClerc*, 444 F.3d at 429 (Higginbotham, J., dissenting); then citing *Toll v. Moreno*, 458 U.S. 1, 12–13 (1982); then citing *Entwistle v. S.D. High Sch. Activities Ass'n*, Civ. 06-4030-KES, 2006 WL 8453556, at *3–4 (S.D. March, 24, 2006); then citing *Fusato v. Wash. Interscholastic Activities Ass'n*, 970 P.2d 774, 769–79 (Wash. Ct. App. 1999); then citing *Makindu v. Ill. High Sch. Ass'n*, 40 N.E.3d 182, 191 (Ill. App. Ct. 2015); and then citing *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 96 (D. Me. 2018)).

[129] *Opposition* at 17–18.

[130] *Dandamudi*, 686 F.3d at 74–75.

prohibiting H1-B and TN visa holders—nonimmigrant aliens—from obtaining state licenses to practice as pharmacists.[131]

UHSAA's arguments regarding *Dandamudi* are unpersuasive.  UHSAA's first argument concerns *Dandamudi*'s conclusion that "it would be 'absurd' to review state action impacting *lawful* nonimmigrant aliens under a standard lower than or equal to that employed in [*Plyler v. Doe*] to review state action impacting *unlawful* aliens."[132]  UHSAA submits *Dandamudi*'s reliance on *Plyler* is misplaced because the Supreme Court "has gone to great lengths to limit *Plyler*'s holding to its specific facts," which concerned a state law that denied undocumented children access to public education.[133]  However, the case UHSAA cites for the proposition that the Supreme Court has limited *Plyer* to its specific facts, *Kadrmas v. Dickinson Public Schools*,[134] did not examine the straightforward, comparative principle *Dandamudi* applied—that "[u]ndocumented aliens cannot be treated as a suspect class."[135]  Likewise, *Kadrmas* did not concern an alienage classification.  The case concerned a generally-applicable state law that allowed school districts to charge families the cost of bus transportation, and the Court examined *Plyler* in determining the educational concerns at issue did not subject the law to heightened scrutiny.[136]  In any case, UHSAA overrepresents the Second Circuit's reliance on *Plyler* by failing to account for the independent justifications the Circuit offered in applying strict scrutiny.

---

[131] *Id.* at 69–70, 79.

[132] *Opposition* at 18 (quoting *Dandamudi,* 686 F.3d at 78); *see also Dandamudi*, 686 F.3d at 74 (explaining the *Plyler* plaintiffs' "unlawful status eliminated them from the suspect class of aliens generally").

[133] *Opposition* at 18.

[134] 487 U.S. 450 (1988).

[135] *Plyler*, 457 U.S. at 223; *see also id.* at 219 n.19 (explaining "undocumented status" is not a "constitutional irrelevancy").

[136] *Kadrmas*, 487 U.S. at 453–59.  The Court rejected this argument.  *Id.* at 459.

For example, UHSAA makes no note of the Second Circuit's substantial discussion of *Graham v. Richardson*, "the lodestar of the [Supreme] Court's alien discrimination doctrine."[137]

UHSAA's second argument is that it is overly "dogmatic" to interpret Supreme Court precedent to contain only "two sharply defined exceptions" to the general rule that alienage classifications are subject to strict scrutiny.[138]  Quoting the Court's opinion in *Foley v. Connelie*, UHSAA argues the Court has "never suggested . . . all limitations on aliens are suspect,"[139] and that "[i]t would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of strict scrutiny."[140]  But UHSAA quotes *Foley* out of context.  *Foley* expressly concerns the political and government function exception to the general rule that alienage classifications are subject to strict scrutiny, and the quoted statements come from a portion of the decision describing the unique justifications for that exception.[141]  Subsequent Supreme Court precedent, *Bernal v. Fainter*, also describes the political and government function exception outlined in *Foley* as "a *narrow* exception to the rule that discrimination based on alienage triggers strict scrutiny."[142]

UHSAA's final argument urges *Dandamudi* is inapplicable to the present facts because F-1 visa holders "are far less similar to immigrant aliens than the *Dandamudi* plaintiffs."[143]  However, UHSAA points to no relevant precedent that "counsels us to 'judicially craft[] a subset

---

[137] *Dandamudi*, 686 F.3d at 72–78.  UHSAA's Opposition cites *Graham* only once, in reference to Plaintiffs' Supremacy Clause claim.  *Opposition* at 25.

[138] *Opposition* at 19.

[139] *Id.* (quoting *Foley v. Connelie*, 435 U.S. 291, 294 (1978)).

[140] *Id.* (quoting *Foley*, 435 U.S. at 295) (internal quotation marks omitted).

[141] *See Foley*, 435 U.S. at 294–95.

[142] *Bernal*, 467 U.S. at 220 (emphasis added) (citing *Foley*, 435 U.S. at 297).  Tellingly, *Dandamudi* cited *Foley* as the basis of the political and government function exception.  *See Dandamudi*, 686 F.3d at 73–74.

[143] *Opposition* at 19.

of aliens, scaled by how [we] perceive the aliens' proximity to citizenship.'"[144]  The court agrees

with the Second Circuit that "[t]he Supreme Court has repeatedly announced a general rule that

classifications based on alienage are suspect and subject to strict scrutiny review," and "we

should take the Supreme Court at its word."[145]  If additional exceptions to this general rule are to

be crafted, they will have to originate with a higher court than this one.

In any case, the court is doubtful the differences between F-1 visa holders, H1-B and TN

visa holders, and immigrant aliens are as meaningful as UHSAA suggests.[146]  For example,

although F-1 visa holders are admitted to the United States "temporarily and solely for the

purpose of pursuing . . . a course of study,[147] there is no limit on how many years an individual

can reside in the United States on an F-1 visa, nor a limit on how many academic programs an

individual can complete.  An F-1 student who pursues a high school diploma, bachelor's degree,

and graduate degree in the United States could easily spend more than a decade building a life in

the United States.  Likewise, the Internal Revenue Service treats certain F-1 students who have

been in the United States more than five calendar years as resident aliens for tax purposes.[148]

As Judge Campbell reflected, "the distinction[s] between resident and nonresident aliens

[are] not always clear," and the "categories themselves are somewhat fluid."[149]  Accordingly,

"the court is skeptical that the Supreme Court would apply widely divergent levels of scrutiny

---

[144] *Dandamudi*, 686 F.3d at 76 (quoting *LeClerc*, 444 F.3d at 429 (Higginbotham, J., dissenting)).

[145] *Id.* at 78 (quoting *LULAC*, 500 F.3d at 542 (Gilman, J., dissenting)).

[146] Per *Dandamudi*, both H1-B and TN visa holders are allowed to remain in the United States for an initial period of three years and apply for three-year extensions of the initial period.  *Id.* at 70.  However, H1-B visa holders are only allowed to apply for one such extension.  *Id.*  TN visa holders can apply for additional three-year extensions.  *Id.* Both types of visa holders are also allowed to apply to become legal permanent residents and can receive visa extensions while the federal government considers their applications.  *Id.* at 71.

[147] *Opposition* at 20 (quoting 8 U.S.C. § 1101(a)(15)(F)(i)).

[148] *TRO Decision* at 18.

[149] *Id.*

[to] categories of aliens" and joins Judge Campbell's assessment that classifications based on nonimmigrant alien status are alienage classifications subject to strict scrutiny.[150]

### 2. Scrutiny Analysis

Looking to the facts, the court agrees with Judge Campbell that the record does not show the Student Visa Eligibility Rule survives heightened scrutiny, let alone strict scrutiny.  On this issue, Judge Campbell explained a law must advance a "sufficiently important government interest" and must be "substantially related" to that interest in order to survive heightened review.[151]  Judge Campbell then weighed the two interests UHSAA cited in support of the Student Visa Eligibility Rule: (1) "preventing the mistreatment of students on F-1 visas" and (2) "ensuring fair competition for high school students in Utah."[152]  Accepting UHSAA's argument that these interests were sufficiently important to justify some degree of discrimination under the Equal Protection Clause, Judge Campbell concluded the record did not show the Student Visa Eligibility Rule was substantially related to them.[153]  Regarding the mistreatment of students on F-1 visa, Judge Campbell outlined her "deep[]" concern that UHSAA had not disciplined any of the accused coaches or school officials, instead choosing to "limit[] the number and kind of athletic opportunities for international students in ways that these students would not necessarily choose."[154]  Regarding fair competition, Judge Campbell noted the record supported significant recruiting violations by the LCA soccer team, the LCA basketball team, and the Juan Diego

---

[150] *Id.*

[151] *Id.* at 22 (quoting *Fowler v. Stitt*, 104 F.4th 770, 794 (2024)).  *See also Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 959–60 (10th Cir. 2003) (establishing it is a state actor's burden to demonstrate that a challenged law satisfies heightened scrutiny in a challenge to a gender-based city ordinance); *Free the Nipple-Fort Collins*, 916 F.3d at 803–05 (same).

[152] *TRO Decision* at 22–26.

[153] *Id.*

[154] *Id.* at 23.

basketball team.[155]  However, Judge Campbell explained the evidence did not show "UHSAA ha[d] taken any specific action" to investigate or discipline those violations, and that the evidence showed the recruiting issue seemed to involve foreign and non-foreign students alike.[156]

Here, UHSAA proffers the same interests in support of the Student Visa Eligibility Rule and does not point to any new evidence justifying a departure from Judge Campbell's well-reasoned conclusion that they are not substantially related to the Student Visa Eligibility Rule.[157] With respect to the issue of student mistreatment, for example, UHSAA has not offered any new evidence establishing wider patterns and practices of abuse that the Student Visa Eligibility Rule would remediate.  Nor has UHSAA offered evidence that it has taken any new action against the coaches or school officials accused of engaging in abusive conduct toward F-1 students,[158] such that the Student Visa Eligibility Rule would appear consistent with a wider effort to protect all students.  UHSAA cites to declarations filed by Cuff and Hammer in support of the general propositions that "policing . . . abuse is uniquely difficult for . . . UHSAA" and "[a]ttempts by [] UHSAA to investigate and discipline abuses have been met with legal objections and lawsuits."[159]  But the declarations and attached exhibits establish only that on September 17, 2024, UHSAA sent inquiry letters to Juan Diego and LCA informing them that UHSAA was

---

[155] *Id.* at 24–25.

[156] *Id.* at 25.

[157] *Opposition* at 22–24.

[158] This deficiency is concerning given Plaintiffs' proffer of evidence that UHSAA recently testified before the Utah State Legislature's Rule and General Oversight Committee and admitted it had never reported any misconduct allegations to law enforcement or taken other non-discriminatory steps to protect students from the alleged perpetrators.  *Rules Committee Transcript* at 21:7–23:18.

[159] *Opposition* at 22–23.

investigating *recruiting* allegations and requesting related information.[160]  The declarations do not outline any efforts UHSAA has made to investigate and discipline member schools for *mistreatment* allegations.[161]

Furthermore, UHSAA has not provided evidence addressing Judge Campbell's concern that the Student Visa Eligibility Rule punishes the victims of abuse more than the perpetrators.[162] At oral argument, Plaintiffs compared UHSAA's decision to disincentivize abuse against F-1 students by banning them from competition, or at least post-season competition, to a decision to disincentivize abuse against female employees by banning them from the workplace.  The court thinks this analogy is apt and is not satisfied that a ban of this nature is substantially related to UHSAA's interest in preventing the mistreatment of students on F-1 visas.

With respect to the recruiting issue, UHSAA has provided some additional evidence of F-1 recruiting violations.  Specifically, it has provided a series of declarations from officials at small Utah high schools asserting LCA, Juan Diego, and Judge Memorial are upsetting the competitive balance in basketball and football by recruiting international students.[163]  But this evidence does not detract from Judge Campbell's assessment that F-1 recruiting is a small part of a bigger issue.  At the evidentiary hearing noted above, Cuff testified there are only one hundred

---

[160] *See* Dkt. 95-1, *Declaration of Rob Cuff in Support of Opposition to Motion for Preliminary Injunction* (*Second Cuff Decl.*) ¶¶ 5–6 (emphasis added); *id.* at Ex A, Ex. B; *Second Hammer Decl.* ¶ 10.

[161] Notably, the date of the letters reveals UHSAA took this action a week after counsel for Szymakowski sent a demand letter advising UHSAA of his position that the Student Visa Eligibility Rule was unlawful, *see Demand Letter* (dated September 10, 2024), and approximately a year after UHSAA first became of aware of the mistreatment allegations against the Juan Diego basketball program.  *See Hammer Decl.* ¶¶ 6–7.

[162] *TRO Decision* at 23.

[163] *See generally* Dkt. 95-3, *Declaration of Scott Mouritsen in Support of Opposition to Motion for PI*; Dkt. 95-4, *Declaration of Lora Nichols in Support of Opposition to Motion for PI*; Dkt. 95-5, *Declaration of Kena Rydalch in Support of Opposition to Motion for PI*; Dkt. 98, *Declaration of Anthony Mitchell in Support of Opposition to Motion for PI*; Dkt. 99, *Declaration of Marc Miller is Support of Opposition to Motion for PI*; Dkt. 100, *Declaration of Patrick Amico in Support of Opposition to Motion for PI*; Dkt. 101, *Declaration of Tyler Roberts in Support of Opposition to Motion for PI*.

or so F-1 students in Utah high schools,[164] and Hammer testified the practice of member schools recruiting non-foreign players in violation of UHSAA rules is concerningly common.

UHSAA has also provided additional evidence that it struggles to investigate and discipline recruiting violations without school cooperation by producing Juan Diego and LCA's limited responses to the inquiry letters described in the preceding paragraph.[165]  However, the court remains unpersuaded that UHSAA is "powerless" to enforce its universally-applicable recruiting rules against offending schools.[166]  Beyond the inquiry letters, UHSAA has not produced any evidence it has even tried to discipline F-1 recruiting violations and Cuff testified at the evidentiary hearing that UHSAA has a long history of investigating and disciplining non-foreign recruiting violations, including violations by uncooperative parties.[167]

Thus, although the court agrees with Judge Campbell that both the abuse and recruiting allegations levied against several UHSAA members are troubling, the court finds the Student Visa Eligibility is incongruent with these issues and fails heightened scrutiny.

### B.  Supremacy Clause

Although Szymakowski moved for a TRO based only on his Equal Protection Clause claim, Judge Campbell found the Supreme Court's decision in *Toll v. Moreno* compelled her to

---

[164] The evidence available to Judge Campbell at the TRO stage indicates there were seven F-1 student athletes at Juan Diego, six F-1 student athletes at Judge Memorial, eleven F-1 student athletes at St. Joseph's, and 138 F-1 student athletes at LCA during the 2023–2024 school year (162 total).  *See* Dkt. 54-7, *F-1 Students That Competed in Sports at Juan Diego, Judge Memorial, St. Joseph, and LCA*.

[165] *See Second Cuff Decl.* at Ex. C, Ex. D.

[166] *TRO Decision* at 26.

[167] Cuff also testified that UHSAA has recently engaged in productive conversations with officials at LCA—the overwhelming focus of the recruiting allegations at issue in this case—about moving several LCA teams to independent status.

evaluate the Rule under both the Equal Protection Clause and the Supremacy Clause.[168]  On the Supremacy Clause issue, she expressed concern that the Rule "conflict[ed] with . . . overriding national policies in an area constitutionally entrusted to the Federal Government."[169] Citing *Toll* and *Dandamudi*, Plaintiffs now argue this concern was well-placed and the Student Visa Eligibility Rule imposes burdens on lawfully-admitted F-1 students that Congress did not contemplate.[170]  UHSAA counters that this argument fails because Plaintiffs have presented no evidence that "Congress preempted state regulation of every aspect of F-1 students' extracurricular activities."[171]  However, UHSAA applies the wrong standard and the court agrees with Plaintiffs.

As Judge Campbell explained, and UHSAA entirely fails to recognize, *Toll* reviewed the federal government's primacy in the realm of immigration and announced a clear rule for evaluating state regulations affecting specific classes of federal visa holders under the Supremacy Clause: "state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress."[172]  The Court did not apply a more traditional preemption analysis,

---

[168] *Id.* at 19, 31–32.  As Judge Campbell explained, *Toll* provided the Court an opportunity to decide whether a state law that discriminated against nonimmigrant aliens was constitutionally valid under (1) the Equal Protection Clause and (2) the Supremacy Clause, and the Court elected to decide the issue under the Supremacy Clause only.  *Id.*

[169] *Id.* at 31.

[170] *Motion* at 18–21.

[171] *Opposition* at 25–27.

[172] *Toll*, 458 U.S. at 12; *id.* at 12–15 (finding a University of Maryland policy prohibiting G-4 visa holders from paying in-state tuition imposed burdens beyond those identified in the federal laws setting the terms and conditions of their lawful existence in the United States); *see also Dandamudi*, 686 F.3d at 79–81 (finding a New York law prohibiting nonimmigrant aliens from working as licensed pharmacists imposed burdens on those aliens in excess of those contemplated by Congress).  *Toll* suggested this rule might not apply in situations where "Congress has done nothing more than permit a class of aliens to enter the country temporarily," but provided the state law at issue, which denied in-state tuition benefits to noncitizens with G-4 visas, did not raise such an issue.  *Toll*, 458 U.S. at 13.  And UHSAA does not raise a similar argument here.

evaluating first whether any relevant federal law expressly preempted the state law at issue, and then whether any relevant federal law impliedly preempted the state law at issue.[173]

Applying *Toll* here, the Student Visa Eligibility Rule violates the Supremacy Clause because it discriminates against lawfully admitted F-1 students and imposes burdens beyond those Congress contemplated.  The Immigration and Nationality Act (INA)—the "comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents"— requires F-1 students to maintain "a residence in a foreign country" and enter the United States "temporarily and solely for the purpose of pursing . . . a course of study" at a federally-sanctioned school.[174]  Related federal regulations impose additional terms, such as general requirements that F-1 students be proficient in English and have sufficient funds to support themselves in the United States.[175]  But nowhere does federal law "restrict F-1 students from engaging in interscholastic sports or any other aspect of school life."[176]  And at the TRO hearing before Judge Campbell, UHSAA answered "I think we did" when asked whether UHSAA had specifically "decided to impose different standards on [F-1 students] in Utah than the United States Government."[177]

Ignoring *Toll*, and applying a more traditional preemption analysis, UHSAA contends Plaintiffs have not shown they are likely to succeed on their Supremacy Clause claim because

---

[173] *See, e.g.*, *Pueblo of Pojoaque v. State*, 233 F. Supp. 3d 1021, 1095–1100 (D. N.M. 2017) (explaining (1) express preemption, (2) implied field preemption, (3) implied conflict preemption based on physical impossibility, and (4) implied conflict preemption based on the obstacles a state law poses to the accomplishment and executive of Congress' objectives).

[174] 8 U.S.C. § 110(a)(15)(F)(i).

[175] 22 C.F.R. § 41.61(b)(ii)–(iii).

[176] *Motion* at 20.

[177] Dkt. 72, *Transcript of Motion for Temporary Restraining Order Hearing Held of 10/16/2024* at 83:5–16.

they have only shown federal law "is silent about the topic of the Rule."[178]  UHSAA likewise

argues the Student Visa Eligibility Rule is "congruent" with federal law because an F-1 visa only

permits "a course of study," not "participation in post-season athletics."[179]  However, UHSAA

has given the court no reason to disregard *Toll*,[180] binding precedent that compels the court to

consider the Student Visa Eligibility Rule relative to the terms and conditions upon which

Congress granted F-1 students admission to the United States.[181]  Beyond granting F-1 students

permission to pursue a course of study, those terms grant F-1 students permission to attend the

approved American high schools of their choice.  Surely, this unique permission at least includes

permission to engage in those activities and experiences that are incidental to the American high

school experience.[182]

Finally, as Judge Campbell explained, UHSAA's contention that states are free to

regulate the terms and conditions of an F-1 student's lawful existence in the United States

---

[178] *Opposition* at 27.

[179] *Id.*

[180] UHSAA cites to *DeCanas v. Bica* for the proposition that the Court "has never held that every state enactment which in any way deals with aliens . . . [is] per se pre-empted" by the federal authority over immigration. *Opposition* at 25–26 (quoting *DeCanas*, 424 U.S. at 355).  And the court does not disagree.  But UHSAA's reliance on *DeCanas* to suggest states have wide authority to impose burdens on legal immigrants beyond those contemplated by Congress is misplaced.  In *DeCanas*, the Court considered a Supremacy Clause challenge to a state regulation that prohibited employers from hiring undocumented aliens.  *DeCanas*, 424 U.S. at 353–54.  The Court, in turn, issued the quoted statement while distinguishing state policies *regulating immigration*—that is, policies concerning "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"—from state policies *affecting immigrants*—that is, policies that merely deal with aliens.  *Id.* at 354–56.

[181] *Toll* qualified that the rule articulated above might not apply in situations where "Congress has done nothing more than permit a class of aliens to enter the country temporarily."  *Toll*, 458 U.S. at 12–13.  However, UHSAA does not advance a related argument and, "[i]n this case, Congress *has* done more than merely allow the nonimmigrant to enter temporarily."  *Dandamudi*, 686 F.3d at 80–81.  It has granted them permission to study in American high schools.

[182] At oral argument, USHAA identified federal regulations concerning J-1 students' participation in extracurricular activities and argued the absence of any comparable regulations concerning F-1 students evidenced Congress's intent to permit states to regulate the matter themselves.  *See* 22 C.F.R. § 62.25(h).  Absent any additional context, the court is not convinced.  The existence of these regulations might just as well evidence Congressional recognition that F-1 students who come to the United States for a full high school program are more like permanent-resident and citizen students than J-1 students, who come to the United States on exchange programs designed to "increase mutual understanding between the people of the United States and the people of other countries."  *Id.* § 62.1(a).

beyond what Congress expressly contemplated presents a "slippery slope."[183]  May UHSAA preclude F-1 students from participating in co-curricular debate, music, and theater competitions?  May state-affiliated career and technical education organizations like DECA exclude F-1 students from competition?  May public schools require F-1 students to move furtively from classroom to classroom without socializing, eating lunch in the cafeteria, or attending school assemblies?  The likely answer to each question is no.  In turn, the court concludes Plaintiffs have shown they are substantially likely to succeed on both their Equal Protection Clause and Supremacy Clause claims.

### III.    Irreparable Harm

Looking to the remaining preliminary injunction factors, the court finds Plaintiffs have demonstrated they will suffer irreparable harm absent a preliminary injunction because they have shown it is substantially likely the Student Visa Eligibility Rule violates the Equal Protection Clause.  In this respect, Judge Campbell likewise found Szymakowski would suffer irreparable harm absent a TRO because the Student Visa Eligibility Rule violated the Equal Protection Clause and denied him the distinctive opportunity to participate in varsity athletics.[184]  Plaintiffs' position reflects Judge Campbell's decision,[185] and UHSAA does not appear to dispute that a finding in Plaintiffs' favor on the Equal Protection Clause issue per se establishes Plaintiffs will

---

[183] *TRO Decision* at 32.

[184] *Id.* at 32–36.

[185] *Motion* at 6–8.

suffer irreparable harm absent an injunction.[186]  Instead, UHSAA argues the inability to

participate in varsity athletics, alone, does not constitute irreparable harm.[187]

UHSAA's argument misses the mark.  As Judge Campbell explained, "the deprivation of

'individual rights' in violation of the Equal Protection Clause" is per se irreparable and supports

a finding of irreparable harm on a motion for preliminary injunctive relief.[188]  And as outlined

above, Plaintiffs have shown it is substantially likely the Student Visa Eligibility Rule deprives

them of their constitutional right to equal protection.  The court need not consider whether the

loss of varsity opportunity supports a distinct finding of irreparable harm.

## IV.   Balance of Equities

The court also finds the loss of constitutional rights Plaintiffs will suffer absent a

preliminary injunction outweighs the harm a preliminary injunction poses to UHSAA and others.

On this issue, Judge Campbell found that (1) UHSAA was not harmed by the court's interference

with its internal affairs, as federal courts have the "unequivocal" power to enjoin unconstitutional

laws, (2) UHSAA could mitigate any harm arising from the court's decision to award injunctive

relief only to Szymakowski by voluntarily choosing to enjoin the rule's application against all

students pending the final resolution of this case; (3) an injunction would not harm other students

competing for the same athletic positions as an F-1 students insofar as the students competed for

playing time based on their "comparative merits," and (4) even if an injunction would encourage

"eleventh-hour eligibility determinations," it would prevent the likely violation of a

constitutional right.[189]  UHSAA abandons most of these arguments, but maintains an injunction

---

[186] *Opposition* at 27–28.

[187] *Id.*

[188] *TRO Decision* at 33 (quoting *Leachco, Inc.*, 103 F.4th at 755).

[189] *Id.* at 36–37.

would harm the Association and its members by interfering in their internal affairs, and adds an injunction would "adversely affect the competitive balance and fairness among the scores of member schools."[190]

Neither of UHSAA's arguments are persuasive.  First, the court agrees with Plaintiffs and Judge Campbell that UHSAA's interest in managing its internal affairs and representing its members "is merely an acknowledgment that any litigant appearing before the court may suffer harm from an adverse ruling."[191]  Second, the court agrees with Plaintiffs that their loss of equal protection under the law significantly outweighs any loss of competitive balance and fairness an injunction might cause.  As the court already expressed, it shares UHSAA's concerns about the effect of recruiting on high school athletics.  But the evidence shows UHSAA has other tools to combat recruiting, and Utah's recruiting problem is much bigger than the 100 or so F-1 students in the state.  UHSAA can minimize any loss of competitive balance and fairness following from an injunction by using existing tools to address both the domestic and international aspects of Utah's recruiting problem.

**V.    Public Interest**

Finally, the court finds that the public interest favors a preliminary injunction.  On this issue, UHSAA argues the Student Visa Eligibility Rule promotes the public interest in "*safe, fair, and reasonable* access to . . . interscholastic competition" and suggests an injunction would

---

[190] *Opposition* at 28–30.

[191] *Motion* at 21–23; *TRO Decision* at 36.  The court is troubled by UHSAA's assertion that an injunction would "nullify the rights of every member school" who voted for the Student Visa Eligibility Rule when Plaintiffs have shown it is substantially likely the Student Visa Eligibility Rule "nullifies" F-1 students' rights under the United States Constitution.  *Opposition* at 29.  As Plaintiffs point out, a significant "purpose[] of the Equal Protection Clause is to protect 'discrete and insular' minorities against persecution from the majority."  *Reply* at 10; *see also TRO Decision* at 12–13 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)); *TRO Decision* at 35 (quoting *Graham*, 403 U.S. at 372).  The court may not disregard that purpose to satisfy the majority.

result in "unregulated participation."[192]  But Judge Campbell already weighed and rejected these arguments, and the court concurs with her analysis.[193]  As Szymakowski did at the TRO stage, Plaintiffs simply ask to be treated the same as non-foreign students, and the public interest "is best served by a decision that upholds the equal protection of the laws to all persons who are lawfully within the state's jurisdiction."[194]

## CONCLUSION

For these reasons, the court GRANTS Plaintiffs' Motion for Preliminary Injunction.[195] UHSAA is enjoined from enforcing the challenged portion of the Student Visa Eligibility Rule, *Interps & Guidelines 1.9.3(B)(1)*, pending the final resolution of this case.  The court finds no need for Plaintiffs to pay a bond under Federal Rule of Civil Procedure 65(c).

SO ORDERED this 2nd of January 2025.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[192] *Opposition* at 30.

[193] *TRO Decision* at 37.

[194] *Id.* at 37.

[195] Dkt. 79.